615 So.2d 535 (1993)
Melinda S. WHITE, Plaintiff-Appellee,
v.
John E. FRENKEL, III, and Mid-South Sports, Inc., Defendants-Appellants.
No. 92-241.
Court of Appeal of Louisiana, Third Circuit.
March 3, 1993.
*536 J.J. McKernan, Thomas Lewis Walker, Baton Rouge, for Melinda S. White.
Steven D. Crews, Natchitoches, David A. Hughes, Alexandria, for John E. Frenkel, III, et al.
Alexander Negus Breckinridge IV, New Orleans, Charles Gordon Tutt, Shreveport, for Mid-South & Hartford.
*537 Before DOMENGEAUX, C.J., and KNOLL and SAUNDERS, JJ.
SAUNDERS, Judge.
This appeal is brought on behalf of defendants-appellants, Mid-South Sports, Inc. (hereinafter "Mid-South"), and the Hartford Accident and Indemnity Company (hereinafter "Hartford"), Mid-South's comprehensive general liability insurer, following contradictory verdicts in two consolidated cases, one of which was tried to a jury and the other to a judge.
On November 24, 1986, a vehicle owned by plaintiff-appellee, Melinda White, and operated by defendant-appellant, John E. Frenkel, III, (hereinafter "Frenkel"), was proceeding northbound on La. Highway 1, just south of Natchitoches, when it attempted to pass two tractor trailers. In doing so, the White vehicle collided with a southbound vehicle operated by Jason Rachal. Mr. Rachal was killed and Melinda White and John Frenkel sustained injuries.
Two lawsuits were filed following this accident. Melinda White brought an action against Frenkel and Mid-South on the theory that Frenkel was a Mid-South employee who was in the course and scope of his employment at the time of the accident. This suit was consolidated with the action which Mrs. Rachal brought on her own behalf, on behalf of her husband's estate, and on behalf of her minor children, plaintiffs and appellees. The Rachal action against Frenkel and Mid-South alleged the same respondeat superior liability theory and also named Mid-South's general liability insurer, Hartford, as a defendant.
The White case was tried to the trial judge, while the Rachal case was tried to a jury. The jury returned a verdict in which it found that Frenkel was not a Mid-South employee and was not in the course and scope of his employment at the time of the accident. The jury also found that Frenkel was 90% at fault, while the decedent, Mr. Rachal, was 10% at fault and awarded a total of $805,000.00 in damages to the Rachals.
Subsequently, the trial judge ruled in the White case that Frenkel was 100% at fault and, contrary to the jury's verdict in Rachal, that Frenkel was a Mid-South employee and in the course and scope of his employment at the time of the accident.[1] The trial judge awarded Melinda White a total of $689,376.74. In harmonizing the jury's verdict in Rachal with his own in White, the trial judge granted the Rachals' motion for judgment notwithstanding the verdict and denied Mid-South and Hartford's motion for new trial.[2]
Frenkel,[3] Mid-South and Hartford appeal from the judgments of the trial court and the jury verdict as to damages. After our review of the record and appellate briefs, we agree with the trial court's finding that the more reasonable assessment of the facts is that Frenkel was a Mid-South employee in the course and scope of his employment at the time of the accident.

ASSIGNMENTS OF ERROR
Mid-South and Hartford appeal, assigning the following as error:
(1) The trial court erred in finding that Frenkel was an employee rather than an independent contractor of Mid-South at the time of the accident.
(2) The trial court erred in finding that Frenkel was in the course and scope of his employment with Mid-South at the time of the accident.[4]
(3)(a) The trial court erred in failing to allow Dr. Herd to testify as to the effects of alcohol on a person's ability to drive.
(b) The trial court erred in failing to find Jason Rachal comparatively negligent and the jury erred in failing to find Jason Rachal more than 10% comparatively *538 negligent, insofar as Jason Rachal was legally intoxicated at the time of the accident.
(4) The trial court's award of damages to Melinda White was excessive and constituted an abuse of discretion.
(5) The trial court erred in failing to grant Mid-South's motion for judgment notwithstanding the verdict as to the jury's award to the surviving children in Rachal for general damages and on the award for loss of support.

FACTS
The facts surrounding the accident of November 24, 1986, were correctly set forth by the trial judge, in his reasons for judgment, as follows:
"The facts as to how this accident occurred are undisputed and can lead to no other conclusion than that John E. Frenkel, III was negligent in the operation of his vehicle which led to the death of Jason Randolph Rachal and to the serious and permanently disabling injuries sustained by Melinda S. White.
The undisputed facts as to how the accident occurred showed that Mr. Frenkel was operating a passenger vehicle in a northbound direction on Louisiana Hwy. 1 in Natchitoches Parish, Louisiana on November 24, 1986 at approximately 10:00 p.m.....
The testimony of the investigating state trooper and the cross country truck drivers who were witnesses to this accident led both the court and the jury to conclude that Mr. Frenkel, while traveling northbound on Louisiana Highway 1 with Melinda S. White as a sleeping passenger in his vehicle, overtook three northbound tractor-trailer trucks and caused this tragic accident, which killed Mr. Rachal and left himself and Ms. White permanently injured...."

ASSIGNMENT OF ERROR NO. 1
The first issue to be determined is whether the trial court erred in finding that Frenkel, a professional wrestler, was an employee of Mid-South rather than an independent contractor. We find that the trial court was correct in its determination that Frenkel was an employee of Mid-South and adopt the trial court's excellent reasons for judgment, as follows:
"The court will first address the issue of whether Mr. Frenkel was an employee of Mid-South Sports, Inc., or an independent contractor under contract to Mid-South Sports, Inc. This issue has been before the appellate courts of this state time and again over the years and the following guidelines have evolved to assist courts in making the distinction between employee status or independent contractor status:
(1) The existence of a valid contract between the parties;
(2) That the work being done was of an independent nature such that the contractor may employ non-exclusive means in accomplishing it;
(3) The contract calls for a specific piece work as a unit to be done according to the independent contractor's own methods without being subject to the control and direction of the principal, except as to result of the services to be rendered;
(4) The existence of a specific price for the overall undertaking; and
(5) A specific time and duration is agreed upon in the contract and is not subject to termination at the will of either side without liability for breach. Hickman v. Southern Pacific Transport Company, 262 La. 102, 262 So.2d 385 (1972); Poynor v. Cure, 443 So.2d 1151 (La.App. 5th Cir.1983), writ denied, 446 So.2d 1225 (La.1984); Smith v. Crown Zellerbach, 486 So.2d 798 (La. App. 1st Cir.1986), writ denied, 489 So.2d 246 (La.1986).
The court notes at the outset that none of the elements required to show a relationship of principal and independent contractor existed between Mr. Frenkel and Mid-South Sports, Inc. The very first requirement, and perhaps the most important because its existence seems to be implied in all the other requirements, is the existence of a contract. The evidence was undisputed that Mr. Frenkel signed no contract and although there was testimony that a contract *539 was prepared for him to sign the fact that he did not sign it did not cause his employment as an entertainer/wrestler to be terminated. The second condition, that is, "that the work being done was of an independent nature such that the contractor may employ non-exclusive means in accomplishing it" certainly was not present here. Mr. Frenkel was told where to go, when to be there and exactly what to do when he got there. He likewise had no control over the third fourth and fifth condition set forth above. Generally, the single most important factor to consider in deciding whether an employer/employee relationship exists is the right of the employer to control the work of the employee. Hickman v. Southern Pacific Transport Co., 262 La. 102, 262 So.2d 385 (1972); Roberts v. State, 404 So.2d 1221 (La.1981); Watson v. Ben, 459 So.2d 230 (La.App. 3rd Cir.1984). However, the evidence is, that John Frenkel was subject to the control and direction of Mid-South. Also, the amount of pay that John Frenkel received was not a specific price, but was determined solely at the discretion of Mid-South. Finally, John Frenkel could be terminated at any time solely at the will of Mid-South without liability. This right to terminate without cause has been found by the Louisiana Supreme Court to be characteristic of the employer/employee relationship. Hickman v. Southern Pacific Transport Co., 262 La. 102, 262 So.2d 385 (1972).
It is well settled by our jurisprudence that besides other factors, the most important test in determining independent contractor status is the right to control the work which is reserved by the employer. Smith v. Hughes Wood Products, 544 So.2d 687 (La.App. 3rd Cir.1989). The evidence showed not only did Mid-South maintain the right to control the work of John Frenkel, but exercised this right.
John Frenkel began wrestling for Mid-South in June of 1986. For the next six months, Frenkel wrestled practically every night for Mid-South in various towns throughout Texas, Louisiana, Arkansas, Mississippi, Oklahoma, and Florida. He wrestled thirty matches in thirty-one days at the direction of Mid-South Sports, Inc. Frenkel could not refuse to wrestle in a match scheduled by Mid-South without being subject to being fined, or being fired. Frenkel and Mr. Watts, the owner of Mid-South, both testified that John Frenkel could not wrestle with any other promoter except Mid-South without Mid-South's permission and if allowed, Mid-South would be paid a percentage of Mr. Frenkel's earnings received from another promoter. Mr. Frenkel and Mr. Watts both testified that Frenkel was not free to substitute another wrestler in a match that Mr. Frenkel had been scheduled to wrestle by Mid-South. Melinda White testified that Frenkel told her that Mid-South controlled who would win and who would lose. Mr. Watts testified that winning was not a factor as to what Mr. Frenkel was paid. Both Mr. Frenkel and Mr. Watts testified that Mid-South decided, at its own discretion, which of their entertainer/wrestlers were preliminary wrestlers and main event wrestlers and that Mid-South had total control over who Frenkel wrestled, where he wrestled, when he wrestled, how much he was paid and that he could be (and in fact was) fired at the will of Mid-South without liability for breach of contract.
Furthermore, Frenkel testified that he had to arrive one hour before his scheduled match and was not allowed to leave the premises after he had completed his match but was told he had to remain in case Mid-South declared to put on a final free-for-all match called "a lights out brawl" where all the Mid-South wrestlers entered the ring and wrestled at the same time. Mr. Frenkel received no additional pay for this. The testimony of Mr. Watts revealed that Mid-South had the right to fine John Frenkel for breaking rules in an amount set solely by Bill Watts, and whether a wrestler was fined was entirely in Mr. Watt's discretion. Mr. Frenkel further testified that he had to do exactly as Mid-South told him or he would be fired. Mr. Frenkel did not share in the proceeds from the sale of concessions, memorabilia or television payments. Mr. Watts testified that all wrestling matches in Louisiana are exhibitions, rather *540 than sporting events, and that Mid-South paid all of the wrestlers, including Mr. Frenkel's opponent for each match. He also testified there is no ranking of the wrestlers based on their ability as there is in boxing since a boxing match is a sporting event as opposed to an exhibition for purposes of entertainment.
Considering all of the evidence taken on the employee vs. contractor status, the court concludes that the fact that there existed no contract between Mr. Frenkel and Mid-South, the fact that virtually all control rested in the hands of Mid-South, that Mid-South, alone, determined the amount the wrestlers would be paid and the fact that Mid-South could fire Mr. Frenkel at will, with no corresponding contractual penalty, leads the court to conclude that Mr. Frenkel was an employee."

ASSIGNMENT OF ERROR NO. 2
The second issue to be determined is whether the trial court erred in finding that Frenkel, as an employee of Mid-South, was in the course and scope of his employment at the time of the accident. Again, we adopt the trial court's well-reasoned findings, as follows:
"Turning now to the issue of whether or not Mr. Frenkel was in the course and scope of his employment at the time of this accident, the court acknowledges the general rule that an employee going to and from his place of employment is not considered as acting within the course and scope of his employment as to render his employer liable to third persons as a result of the employee's negligent acts. Castille v. Sibille, 342 So.2d 279 (La.App. 3rd Cir.1977). Ten years before deciding the Castille case, the Third Circuit had acknowledged the difficulty of making this determination in the case of Rollins v. New York Fire & Marine Underwriters, Inc. 225 So.2d 663 (La.App. 3rd Cir.1969). In the Rollins case, the Third Circuit pointed out that there is no precise rule for determining whether the employee-driver of an automobile is within the course and scope of his employment at the time of the accident and therefore, each case must be decided largely on its own facts. In the Castille case the Third Circuit set out three exceptions to the general rule as follows:
1. If the employer provides transportation, then an injury sustained in an automobile coming to or from work is compensable.
2. If an employer provides expenses for travel he may be liable for the negligence of his employee.
3. If the operation of the automobile is incidental to or for the performance of some employment responsibility then the employer may become responsible for the negligence of the employee.
In this case, Mr. Frenkel had wrestled in thirty towns in four or five states in the preceding thirty-one days. He wrestled in the city of Alexandria, Louisiana earlier, on the night of the accident and in fact, was approximately fifty miles from the site of his last wrestling match when this accident occurred. He was scheduled to wrestle in Shreveport, Louisiana after being off Thanksgiving Day and was approximately 1/3 of the way between Alexandria and Shreveport on the most direct route to that city at the time of this accident. It was the testimony of both Ms. White and Mr. Frenkel that they were not going to stay in Shreveport but were to continue on through Shreveport to spend Thanksgiving Day with their families in Dallas and then to return to Shreveport for the performances to be held there on the Friday after Thanksgiving. Employees of Mid-South testified that Mid-South paid Mr. Frenkel's travel expenses for both automobile and airplane fare when he was on tour. Mr. Frenkel testified that at the time this accident occurred he had been on tour for six months and, in particular, the evidence showed that for the previous thirty-one days he had toured thirty cities in four or five states. Louisiana courts have consistently held that when an employer pays the employee travel expenses the employee is within the course and scope of his employment when travelling for the benefit of the employer. Prothro v. Louisiana Paving Company, Inc., 399 So.2d 1229 (La.App. 3rd Cir.1981), writs denied, 404 So.2d 278 (La.1981); Campbell v. Baker, Culpepper *541 and Brunson, 382 So.2d 1046 (La.App. 2d Cir.1980), writ refused, 385 So.2d 793 (La. 1980). In the case at bar, the employer, Mid-South Sports, Inc., could not accomplish its goal without the entertainer/wrestlers travelling extensively. This is not a situation where an employee drives from his home to a fixed place of employment each day or even the situation where an employee drives from his home to various construction sites over a period of time. This is more akin to the travelling of a salesman who must travel to his employer's customers in order to promote the business of the employer. Also to be reckoned with here is the fact that the extensive travelling required of Mr. Frenkel for the promotion of the business of his employer (thirty cities in thirty-one days throughout Texas, Louisiana, Arkansas, Mississippi, Oklahoma and Florida) was such a grueling schedule as to, no doubt, cause him to be tired and thus an actual contributor to the risk taking he engaged in at the time of this accident. The wrestler's automobile is of extreme importance to Mid-South and their business of promoting wrestling. The wrestler was the money maker for Mid-South. John Frenkel received from Mid-South a two week advance booking sheet prepared by Mid-South informing him of where and when he was to wrestle. Mid-South scheduled John Frenkel to wrestle in exhibitions in towns throughout most of the southeastern states, plus Texas, Arkansas, and Oklahoma almost nightly. Mr. Frenkel was required to criss-cross the southeast in order to get to his next scheduled match. He testified that it was expected of him by Mid-South to drive to every match. Mr. Watts, and his longtime secretary, Georgiana Seay, corroborated this in their testimony. Melinda White testified that she rode in the car with John Frenkel on at least thirty to forty occasions, driving to the next town where Frenkel was to wrestle. Ms. White could remember only two occasions when Frenkel had flown instead of driving. Driving from Alexandria, Louisiana to Shreveport, Louisiana where his next match was to be held, with a stop over for Thanksgiving with his family was an activity arising out of the nature of his employment. Mr. Watts, the employer, testified that he anticipated the necessity of his wrestlers having to drive to and from the various cities where they performed because of the logistics and the time factors involved in wrestling in a different town almost nightly. In Michaleski v. Western Preferred Casualty Company, 472 So.2d 18 (La.1985), the Louisiana Supreme Court found an employee to be in the course and scope of his employment because the employer anticipated the necessity of the employee's journey. In this case, it was absolutely essential for the wrestlers to drive from city to city in order to accomplish the purposes of their employment. In this case, the evidence showed that the wrestler's use of an automobile was incidental to Mid-South's business. Mr. Watts testified that the wrestler's use of the automobile was part of the function of his relationship with Mid-South, in short, a wrestler without an automobile or other reliable means of transportation would not have been employed. The wrestler's automobile was not only incidental to Mid-South's business of promoting wrestling matches but was, in fact, a necessity for the continuation of the business. In Sibley v. Board of Supervisors of LSU, 477 So.2d 1094, on remand, 490 So.2d 307 (La.1986), the Louisiana Supreme Court held that employers are answerable for damages occasioned by their employees in the exercise and functions in which they are employed. In this case, the wrestlers had to travel to wrestling matches in order for there to be a wrestling match. It was Mid-South that put Mr. Frenkel in the position of having to travel either to his home or to the next match during late night hours and Mid-South clearly derived benefits from Mr. Frenkel's extensive travel. In light of the fact that Mid-South could not accomplish its purpose of staging wrestling matches in numerous cities without requiring its wrestler/entertainer employees to travel extensively, the court concludes that Mr. Frenkel was in the course *542 and scope of his employment at the time this accident occurred."
Additionally, Mid-South and Hartford allege that the trial court erred in refusing to allow a contract tendered by Mid-South, into evidence. This contract was signed on John Frenkel's behalf by someone other than Frenkel. There was no evidence presented that anyone had the authority to sign Frenkel's name to the contract. Therefore, we find no error in the trial court's decision that the contract was inadmissible.
Finally, insofar as we agree with the trial court's finding that Frenkel was Mid-South's employee, and was in the course and scope of his employment at the time of the accident, any discussion as to the propriety of the trial court's decision to grant Rachals' judgment notwithstanding the verdict and to deny Mid-South and Hartford's motion for a new trial, is hereby pretermitted as unnecessary.

ASSIGNMENT OF ERROR NO. 3
Mid-South and Hartford contend that the trial court erred in failing to find that Jason Rachal was comparatively negligent in causing the accident. Mid-South and Hartford also contend that the jury erred in failing to find Jason Rachal more than 10% at fault in causing the accident.
Additionally, appellants allege that the trial court erred in refusing to allow Dr. Herd to testify as to the effect of alcohol on a person's ability to drive.
The lab report, referring to Rachal's blood alcohol content at the time of the accident, was admitted into evidence. The trial court determined that Dr. Herd would not be allowed to testify insofar as he had no expertise as to the effects of alcohol on Jason Rachal, as an individual, as opposed to the general effects of alcohol on a person's ability to drive. The trial court found that, if Dr. Herd's testimony would have been allowed, this would have raised the risk of having a substantially prejudicial effect on the jury when, in the trial court's view, Rachal could not have avoided the accident.
Rachal's involvement in the accident was set forth in the trial court's reasons for judgment, as follows:
"Trooper Young Kilpatrick, the investigating State Policeman, was on the scene very quickly and testified that the physical evidence showed that the collision occurred directly in the southbound lane which was Mr. Rachal's lane of travel. Mr. Frenkel never returned to his lane of travel, the northbound lane, after entering the southbound lane. Trooper Kilpatrick estimated that Mr. Rachal was travelling at approximately fifty miles per hour when the accident occurred but that Mr. Frenkel was exceeding the general speed limit law as a result of weather conditions and road surface conditions. Trooper Kilpatrick confirmed that it was 10:00 p.m., raining, very dark and that the road surface was wet as a result of two previous days of steady rain and a light rain at the time of the accident. Trooper Kilpatrick also confirmed that Mr. Rachal had his headlights and windshield wipers on and was driving in his proper lane of traffic and in a safe manner at the time of the accident. Trooper Kilpatrick confirmed, as did the other eyewitnesses, that there was absolutely nothing that Mr. Rachal could have done to avoid being struck head-on. Trooper Kilpatrick testified that the spray being propelled into the southbound lane from the action of the truck tires on the pooled water in the northbound lane obstructed Mr. Rachal's view of the oncoming Frenkel vehicle and further confirmed that Mr. Rachal's route of escape to his left was blocked by traffic and to his right by the deep ditch in close proximity to the travelled portion of the highway."
We find no clear error in the trial court's finding as to the lack of Jason Rachal's fault. Ordinarily, we would reconcile the conflicting judgment/jury verdict as to Jason's comparative negligence. See Thornton v. Moran, 348 So.2d 79 (La.App. 1st Cir.), writs refused, 350 So.2d 897, 898, 900 (La.1977); Deville v. Town of Bunkie, 364 So.2d 1378 (La.App. 3d Cir.1978), writ refused, 366 So.2d 564 (La.1979); Norris v. *543 Bell Helicopter Textron, 495 So.2d 976 (La.App. 3d Cir.1986), writ denied 499 So.2d 85 (La.1987); Bishop v. Shelter Ins. Co., 461 So.2d 1170 (La.App. 3d Cir.1984), writ denied, 465 So.2d 737 (La.1985). In the case sub judice, however, the Rachals have not answered the appeal. Consequently, the issue of lowering Jason's comparative negligence is not before this court. Therefore, we affirm both the jury's verdict in the Rachal case finding Jason 10% comparatively negligent, and the judgment of the trial court in the White case, finding that Frenkel was the sole cause of the accident.

ASSIGNMENT OF ERROR NO. 4
Appellants contend that the trial court's damage award in the White case was an abuse of its discretion and due for substantial reduction.
We adopt the trial court's discussion of Melinda White's damages in pertinent part, as follows:
"Turning now to the issue of damages sustained by the plaintiff, Melinda White, the court notes that this was a violent head-on collision in which both vehicles were travelling at forty to fifty miles per hour when they met in direct head-on contact which damaged both vehicles beyond repair ...
[A]t approximately 11 p.m., Ms. White was taken by ambulance from the accident scene to the Natchitoches Parish Hospital where she was seen and treated in the emergency room for multiple skin lacerations, including cuts to her face and compound fractures to the left fibula, left humerus and right clavicle.... An air splint was applied to her left leg and left arm and she was placed on a long springboard with a T-collar. An IV was administered along with a foley catheter and an N.G. Tube was inserted into a wound in the right hip for drainage. Ms. White was transferred to LSU Medical Center Emergency Center under oxygen at 2 a.m. on November 25, 1988. She remained awake and complained of pain in her left leg in the ambulance.
....
Ms. White was discharged to Gulf Breeze Hospital, via Air Ambulance for local medical care with instructions to remain non-weight-bearing on her left leg.... Ms. White was admitted into Gulf Breeze Hospital on December 2, 1986, where she stayed for twenty-five days. Her hospital management was carried out by Dr. Joe Salter and Dr. B.B. Jordan.... Ms. White was discharged from Gulf Breeze Hospital on December 27, 1986, with a final diagnosis of:
1. Fracture to the femoral neck of the left femur;
2. Fracture of the left humerus;
3. Fracture of the right clavicle;
4. Fracture of the left tibia and left fibula; and
5. Multiple cuts and abrasions, particularly to her face.
....
Upon discharge from Gulf Breeze Hospital, Ms. White continued to be treated by Dr. Joseph Salter. Ms. White was discharged from the hospital with her left arm in a splint, her left leg in a full-length fiberglass cast and her right collarbone was in a splint. The full-length fiberglass cast was not removed from Ms. White's left leg until January 26, 1987, two full months after the accident....
A new long-leg fiberglass cast was applied to the left leg and Ms. White was not allowed to bear any weight on her left leg until February, 1987, at which time a cast boot was placed on her left long-leg cast and she was then allowed to go up to twenty or twenty-five pounds of weight bearing on her left leg with the use of a cane or walker.
On February 23, 1987, Dr. Salter removed the longleg cast on her left leg.... A short-leg plaster cast was applied to her left leg and Ms. White was now allowed up to thirty pounds of weight-bearing on her left leg. Ms. White remained in a short-leg plaster cast until May 11, 1987, nearly six months after the accident.... Ms. White was restricted in her activities because of the continuing problems in her left leg, and was not allowed to ambulate without the *544 use of a walker, or at least a cane. It was not until a year after the accident date that Ms. White was able to move about without the use of a walker or a cane. Ms. White continued to see and be treated by Dr. Joe Salter throughout 1988, and through March of 1989, almost two and one-half years after the accident at which time Dr. Salter referred Ms. White's care to Dr. Philip D. Prosin in San Diego, California. Dr. Prosin first saw Ms. White on September 28, 1989, for complaints of pain in her left hip and problems in her left arm. Dr. Prosin recommended surgery for the removal of the hardware in her left arm and in her left hip. On October 25, 1989, surgery was performed at Scripps Memorial Hospital for the removal of the nails and screws in Ms. White's left hip and her left upper arm. Post-operatively, Dr. Prosin restricted Ms. White's activities and weight-bearing to her left leg for several months to allow the screw holes which remained in her bones to heal. Dr. Prosin also restricted Ms. White from physical activities, such as running, skiing, jumping, and aerobics for one year.
Dr. Salter's deposition was introduced into evidence at trial. Dr. Salter testified that all of Ms. White's fractures were compounded and comminuted, meaning the bone exited through the skin in multiple fragments. The fracture to her right collarbone has resulted in a permanent bump. Dr. Salter testified that as a result of the orthopedic surgeries, Ms. White has a ten-inch-long scar over the outside of her left upper arm, a scar over the lateral thigh, and a scar over her pelvis where Dr. Salter took the bone graft for her arm. Dr. Salter also testified that Ms. White has a permanent lump over her right collarbone and some minor scars to her face. Dr. Salter also testified that Ms. White's injuries are permanent and that because of the injuries sustained in the automobile accident, Ms. White was unable to work for one year following this accident. Ms. White was also seen by Dr. Ronald W. Dennie. Dr. Dennie's deposition was filed into evidence at trial. Dr. Dennie testified that Ms. White's left leg is now shorter than her right leg and there is a slight bowing of her left leg below the knee, both of which are permanent in nature. Dr. Dennie further testified that as a result of these multiple injuries, Ms. White is at risk for developing degenerative changes about her left leg as well as developing back problems because of her leg length discrepancy. Dr. Dennie testified that Ms. White may develop symptomatic back pain, as well as developing degenerative changes in the facet joints in the low back area. Dr. Dennie testified that the long-term effect of the slight bowing below the knee places abnormal mechanics at the knee joint, which over a long period of time may accelerate degenerative changes in that area as well. Dr. Dennie would not rule out the potential of a total left hip replacement as a result of Ms. White's injuries.
Dr. Dennie testified that in his opinion, Ms. White has a ten percent permanent impairment of the left lower extremity due to the shortening of the left leg, and a three percent permanent impairment due to the loss of internal rotation, for a thirteen percent permanent total impairment of the lower extremities, and a five percent permanent impairment of the whole body. Ms. White testified at trial that at the time of the accident, she was earning seventy-five dollars a night while working for the Hyatt Regency Hotel in Arlington, Texas. In addition to multiple orthopedic injuries, Ms. White testified that a tooth was knocked out which ultimately required a root canal. Ms. White testified that she was totally bedridden for three months after the accident and was dependent upon her father and mother for her total care. Ms. White tried to work in June of 1987, but was limited because of her injuries.
Ms. White testified that she has no feeling in her upper left arm as a result of her injury. This has limited Ms. White's use of her left arm. Ms. White gave an example of not being able to pick up objects or to roll down a car window with her left arm, and that she continues to have pain in her left hip and is limited in the type of shoes she can wear. Ms. White also testified that the permanent disability in her left hip has resulted in problems with her balance which results in episodes of falling down since the accident. Also, Ms. White testified *545 that she has lower back pain and that she continues to have pain in her left ankle. As a result of these injuries, Ms. White testified that she can no longer do some of the things that she did prior to the accident, in particular, Ms. White testified that she is not as athletic today as she was prior to the accident. Ms. White is not able to run or jog as well as she did prior to the accident, nor is she able to wear high heeled shoes. Ms. White also has residual pain in her left ankle, left arm, and her left hip, and her lower back and a permanent disability to her left arm and left hip.
Considering the severity of the injuries, the duration and degree of pain from the injuries themselves, as well as the treatment, the pain and inconvenience suffered during the long period of rehabilitation and the permanent disability and disfigurement associated with these injuries the court fixes damages as follows:

A. Past Medical Expenses................. $ 39,376.74
B. Lost Earning Capacity ................ 50,000.00'
C. Past and Future Pain
 & Suffering, Mental
 Anguish, Loss
 of Enjoyment of
 Life, and Permanent
 Disability ........ $600,000.00
TOTAL.................................... $689,376.74"

Based upon the foregoing, we find no manifest error in the damages awarded to Melinda White by the trial judge.

ASSIGNMENT OF ERROR NO. 5
Appellants final assignment of error contends that the award for loss of love and affection to the Rachal children and the award for loss of support was excessive and based on incomplete evidence.
The jury awarded the Rachals damages, as follows:

(A) Loss of past and future
 support to Lydia Dalene
 Rachal, Jason Randolph
 Rachal, II and Lindsey
 Renee Rachal as a result
 of the death of her husband
 and the children's
 father Jason Randolph
 Rachal: $180,000
 ________
(B) Deprivation of companionship,
 security, love
 and affection, mental
 pain and suffering for
 Lydia Dalene Rachal $175,000
 ________
(C) Deprivation of companionship,
 security, love
 and affection, mental
 pain and suffering for
 Jason Randolph Rachal,
 II $225,000
 ________
(D) Deprivation of companionship,
 security, love
 and affection, mental
 pain and suffering for
 Lindsey Renee Rachal $225,000
 ________

Appellants contend that Rachals' expert erred in determining the amount of support which the Rachals lost due to Jason's death. They contend that since Rachals' expert did not use an average of Jason's last four years of work as a guide, that the award was based upon incomplete evidence. Specifically, Jason collected unemployment insurance during one of the four years prior to his death, which, if used in an average, would have had the effect of reducing his earnings during the four years prior to his death. The record revealed that Rachals' expert, in arriving at the figure of $180,000.00 for loss of Jason's past and future support, from the time of the accident until the end of his worklife expectancy, explained that this figure was based upon a retirement age of 60, when, in actuality, most workers retire at 65. Therefore, a five year potential drop in income was built into the expert's figures for loss of support.
We find that a reasonable juror could have arrived at $180,000.00 as a loss for a lifetime of Jason's support based upon this expert's projections. Additionally, we note that Mid-South and Hartford's expert testified and the jury had ample opportunity to listen, analyze and accept the expert testimony of their choice. We find no error in this finding of the jury.
Finally, Mid-South and Hartford contend that the awards of $225,000.00 each for Jason Randolph Rachal, II and Lindsay Renee Rachal, Jason Rachal's children, *546 for loss of companionship, security, love and affection and mental pain and suffering, were excessive. Jason was three (3) years old at the time of his father's death. The evidence revealed that he and his father had a close, loving relationship; that they spent many hours together, fishing and playing together.
Lindsay, Jason's daughter, was only 15 months old at the time of Jason's death. Lindsay likes to talk about her father and, although unlikely, likes to think she remembers him. In an area where it is very difficult to measure individual loss, Lindsay's loss may have been greater than her brother's because she had even less time to make memories with her father. Both of these children missed having their father as a daily presence in their lives, although the record is clear that Lydia Rachal, their mother, and Jason's parents and the children themselves, are all determined to keep his memory alive through photographs, conversations and other keepsakes.
An award in excess of $225,000.00 has recently been affirmed by this circuit in Mathieu v. State, DOTD, 598 So.2d 676 (La.App. 3d Cir.), writ denied, 600 So.2d 665 (La.1992). As such, we find no error in the jury's award of $225,000.00 to Lindsay and Jason for the loss of their father's companionship, security, love and affection.

CONCLUSION
Based upon the foregoing, the judgment of the trial court is affirmed.[5]
Costs of this appeal to be paid by John E. Frenkel, III, Mid-South Sports, Inc. and Hartford Accident and Indemnity Company.

DECREE
AFFIRMED.
NOTES
[1] Judgment of July 12, 1991.
[2] Judgment of August 27, 1991.
[3] Frenkel, although filing a motion for appeal, did not file a brief or assign errors in this court.
[4] Within assignments of error No. 1 and 2, appellants contend that the trial court erred in granting Rachals' motion for judgment notwithstanding the verdict and in denying Mid-South and Hartford's motion for new trial.
[5] The findings of the trial judge and the jury were clearly inconsistent. In a bifurcated trial, where the jury and the trial judge reach conflicting findings of fact and there is an appeal, the court of appeal should resolve these differences and render a single harmonized decision based upon the record as a whole. In such a situation, the manifest error rule is inapplicable, and the court of appeal must decide which decision is more reasonable after a careful examination of the record. Deville, supra; Thornton, supra; Morales v. Tetra Technologies, Inc., 608 So.2d 282, 284 (La.App. 3d Cir.1992), writ denied, 610 So.2d 818 (La.1993).