680 So.2d 1195 (1996)
Robert J. KENNEDY, Plaintiff-Appellant,
v.
MARTIN GAS TRANSPORTATION COMPANY, INC., Defendant-Appellee.
No. 96-100.
Court of Appeal of Louisiana, Third Circuit.
August 21, 1996.
Rehearing Denied October 25, 1996.
Louis Meraux Corne, Lafayette, for Robert Kennedy.
Terry Thibodeaux, Lake Charles, for Martin Gas Transportation.
Before SAUNDERS, AMY and GREMILLION, JJ.
AMY, Judge.
This is a worker's compensation case. Plaintiff appeals from the hearing officer's decision that plaintiff's injuries did not arise in the course and scope of his employment. For the reasons which follow, we affirm.

*1196 DISCUSSION OF THE RECORD
Plaintiff, Robert Kennedy, was employed by defendant, Martin Gas Transportation Company, Inc. [Martin Gas], as a "relief driver" to drive one of Martin Gas' eighteen wheeler trucks when the "principal driver" finished his run for the day. On November 22, 1993, Kennedy, who lived in Jennings, Louisiana, was informed by a dispatcher for Martin Gas that he was to travel to Fuel Stop 36 at the Chloe Exit in Lake Charles, Louisiana, get the keys to the truck, travel to Westlake to pick up a load of sulphur, transport that load to Baton Rouge, and then return the truck to Lake Charles. Kennedy completed his work mission when he delivered the truck back to Fuel Stop 36 at approximately 2:00 a.m. on November 23, 1993. At that point, Kennedy proceeded to drive his own vehicle back home to Jennings. At about 2:45 a.m., Kennedy ran into the rear of a tractor trailer in the east bound lane of Interstate 10, approximately nine miles west of Jennings. Kennedy suffered severe injuries as a result of this accident.
On May 11, 1994, Kennedy filed a claim against Martin Gas, requesting appropriate worker's compensation benefits. Martin Gas answered the action and denied liability, asserting that Kennedy was not in the course and scope of his employment when the accident happened. Kennedy and Martin Gas submitted this matter to the hearing officer on written briefs and depositions. On November 16, 1995, the hearing officer decided that Kennedy was not in the course and scope of his employment at the time of the accident and, thus, not entitled to worker's compensation benefits. Specifically, the hearing officer stated that "Mr. Kennedy was traveling from work at his own expense and this Court believes his employment relationship was suspended from the time he left the eighteen wheeler in route to his home until he would resume his work at some other time."
Kennedy appeals and asserts that the hearing officer erred in finding that he was not in the course and scope of his employment with Martin Gas when he was injured in the accident. Kennedy argues that he was in the course and scope of his employment with Martin Gas when the accident occurred because he was "an employee who traveled in response to instructions from his employer's dispatcher and then performed services" and that the "travel was in furtherance of the employer's business and the risk of accident during the travel was a risk interrelated with the nature of the employment."
Martin Gas, on the other hand, asserts that Kennedy was hired to report to one of several sites in Lake Charles, Louisiana, and that he was not compensated for his transportation to and from work. Martin Gas points out that Kennedy was injured while traveling from where his work mission ended (Lake Charles) to his home (Jennings) when he was injured in the accident. Accordingly, Martin Gas argues, the hearing officer did not err in finding that Kennedy was not in the course and scope of employment when he was injured. We agree.

LAW
La.R.S. 23:1031(A), which sets forth the extent of worker's compensation liability for an employer, states:
If an employee not otherwise eliminated from the benefits of this Chapter receives personal injury by accident arising out of and in the course of his employment, his employer shall pay compensation in the amounts, on the conditions, and to the person or persons hereinafter designated.
An employee seeking worker's compensation benefits must prove by a preponderance of the evidence that an accident occurred within the course and scope of his employment. Clinton v. American Mutual Liability Insurance Co., 422 So.2d 570 (La.App. 3 Cir. 1982). In Guillory v. Interstate Gas Station, 94-1767 (La. 3/30/95), 653 So.2d 1152, 1154, the Louisiana Supreme Court discussed La. R.S. 23:1031:
The terms "arising out of and "in the course of constitute a dual requirement. The former suggests an inquiry into the character or origin of the risk while the latter brings into focus the time and place relationship between the risk and the employment. The two requirements cannot, however, be considered in isolation from each other. A strong showing by the *1197 claimant with reference to the arise-out-of requirement may compensate for a relatively weak showing on the during-course-of requirement, or vice versa. As a corollary it follows that whenever the showing with respect to both requirements is relatively weak a denial of compensation is indicated. [Citations omitted.]
See also Franciso v. Harris Management Company, 94-136 (La.App. 3 Cir. 10/5/94), 643 So.2d 386.
Generally, an employee who has an accident while traveling to and from work is not in the course and scope of employment and, thus, is not entitled to worker's compensation benefits. See Stephens v. Justiss-Mears Oil Co., 312 So.2d 293 (La.1975); Tucker v. Northeast Louisiana Tree Service, 27,768 (La.App. 2 Cir. 12/6/95), 665 So.2d 672, writ denied, 96-63 (La.3/8/96), 669 So.2d 404; writ not considered, 96-100 (La. 3/8/96), 669 So.2d 404; Dupre v. Exxon Pipeline Co., 93-1528 (La.App. 3 Cir. 6/1/94), 638 So.2d 1118, writ denied, 94-2200 (La. 11/18/94), 646 So.2d 379; Folse v. American Well Control, 536 So.2d 686 (La.App. 3 Cir.1988), writ denied, 538 So.2d 592 (La.1989). "This rule is premised on the theory that ordinarily the employment relationship is suspended from the time the employee leaves his work to go home until he resumes his work." Yates v. Naylor Industrial Services, Inc., 569 So.2d 616, 619 (La.App. 2 Cir.1990), writ denied, 572 So.2d 92 (La.1991). "Moreover, an employee's place of residence is a personal decision not directly controlled by the employer, and treating commuting time as part of the determination of course and scope of employment would remove manageable boundaries from the determination." Orgeron ex rel. Orgeron v. McDonald, 93-1353 (La. 7/5/94), 639 So.2d 224, 227. Requiring an employee to show up for work does not make the employee's transportation incidental to the employment contract. Guidry v. Chevron U.S.A., Inc., 461 So.2d 625 (La.App. 1 Cir. 1984).
However, there are exceptions to this general rule. In reviewing this area of our jurisprudence, the second circuit in Yates, 569 So.2d at 619-620, observed:
[T]his rule has been subject to a number of jurisprudentially established exceptions. For example, these exceptions have arisen:
(1) If the accident happened on the employer's premises;
(2) If the employee was deemed to be on a specific mission for the employer, such as making a trip in the interest of his employer's business or pursuant to his employer's order;
(3) If the employer had interested himself in the transportation of the employee as an incident to the employment agreement either by contractually providing transportation or reimbursing the employee for his travel expenses;
(4) If the employee was doing work for his employer under circumstances where the employer's consent could be fairly implied;
(5) If the employee was hurt while traveling to and from one work site to another;
(6) If the employee was injured in an area immediately adjacent to his place of employment and that area contained a distinct travel risk to the employee, also known as the threshold doctrine; and,
(7) If the operation of a motor vehicle was the performance of one of the duties of the employment of the employee.

Michaleski v. Western Preferred Casualty Company, 472 So.2d 18 (La.1985); Hughes v. Gearhart Industries, Inc., 552 So.2d 717 (La.App. 1st Cir.1989), writ denied, 556 So.2d 1280 (La.1990); Justice v. Sylvester, 499 So.2d 590 (La.App. 5th Cir.1986), writ denied, 503 So.2d 491 (La.1987); Guidry v. Chevron U.S.A., Inc., 461 So.2d 625 (La. App. 1st Cir.1984), Smith v. A.I.U. Insurance Company, 457 So.2d 868 (La.App. 3d Cir.1984); Johnson v. Aetna Casualty & Surety Company, 387 So.2d 1340 (La.App. 1st Cir.1980), writ denied, 393 So.2d 746 (La.1980); Castille v. Sibille, 342 So.2d 279 (La.App. 3d Cir.1977), and Gardner v. Industrial Indemnity Company, 212 So.2d 452 (La.App. 1st Cir.1968).
See also Francisco v. Energy Drilling Co., 26,233 (La.App. 2 Cir. 10/26/94), 645 So.2d 796, 798-799.
*1198 Factual findings of the hearing officer in a worker's compensation case are reviewed under the manifest error standard of review. Comeaux v. Sam Broussard Trucking, 94-1631 (La.App. 3 Cir. 5/31/95), 657 So.2d 449. The manifest error standard of review applies in a worker's compensation proceeding even though the evidence before the hearing officer consists solely of written reports, records, and depositions. Benoit v. Martco Partnership, 94-1544 (La.App. 3 Cir. 5/3/95), 657 So.2d 210. In order for an appellate court to set aside a hearing officer's factual findings, the appellate court must conclude from the record that a reasonable factual basis did not exist for the hearing officer's findings and that these findings were clearly wrong. Comeaux, 657 So.2d 449.
Robert Kennedy testified, through deposition, that he had worked for Martin Gas approximately a month and a half before he suffered the accident in November 1993. Kennedy stated that he was employed as a relief driver for Martin Gas. He explained that, during the day, the primary driver would pick up a load, transport that load to the designated location and then return the truck. At that point, Kennedy continued, he would then have instructions from a dispatcher from Martin Gas to pick up the truck, usually in the evening, where the primary driver left it, pick up a load, transport it to the designated location and then return the truck so that the primary driver could operate the truck the next day. He testified that he would call the dispatcher for Martin Gas the day before to ascertain his next assignment.
Kennedy testified that he generally would work out of the Lake Charles area. He stated that he would usually drive from his home in Jennings to one of several places in Lake Charles where the primary driver had left the truck. Kennedy testified that he would pick up a truck from one of the following locations in the Lake Charles area: (1) Fuel Stop 36 near the Chloe exit off of Interstate 10; (2) Road King Truck Stop near downtown; and (3) Matlock Terminal in Sulphur. He stated that he would then drive his truck to plants in the Westlake/Sulphur area and pick up his load and then deliver that load to the designated location.
Kennedy testified that he was paid a commission on a per load basis. He stated that this commission was normally calculated by the weight of the load in the truck and the distance that he would travel. Kennedy testified that he would use his own vehicle to travel to and from work and that Martin Gas did not pay for his travel expenses. He noted that he had to pay for his gasoline in his personal vehicle and that his monthly gasoline bill was about $150.00 to $200.00 per month. Kennedy's testimony established that on rare occasions he would drive to Beaumont or Baytown, Texas, to pick up a truck and that Martin Gas would compensate him for his travel expenses from Lake Charles to Beaumont or Baytown on those occasions. However, driving from Jennings to Lake Charles was never compensated.
Kennedy testified that, on November 22, 1993, he was informed by a dispatcher from Martin Gas to pick up a truck at the Fuel Stop 36 at the Chloe exit on Interstate 10, get the keys to the truck, travel to Westlake to pick up a load of sulphur, transport that load to Baton Rouge, and then return the truck to the Fuel Stop 36. He stated that he picked up the truck at approximately 8:00 p.m. and that he finished his work mission at about 2:00 a.m. the next morning. Kennedy testified that he then proceeded to drive back home to Jennings in his own vehicle. He testified that he hit the back of a flatbed trailer on Interstate 10 about nine miles west of Jennings. Kennedy stated that he suffered severe injuries including a ruptured aorta, fractured vertebrae, fractured ribs, and a circulation problem of the legs. Finally, Kennedy asserts that these severe injuries have caused him to be totally and permanently disabled.
David Dowell testified, through deposition, that he was employed by Martin Gas as a dispatcher. Dowell stated that he worked at Martin Gas' Kilgore, Texas office and that he would dispatch Martin Gas' trucks in the Lake Charles area.
Dowell testified that Kennedy was hired to work out of Lake Charles, Louisiana. Dowell stated that Martin Gas did not reimburse *1199 Kennedy for his business expenses traveling to and from Lake Charles. Dowell specifically stated:
The rule is when we hire people, we hire them to work from a specific location. At the time of their hire, if they're agreeable to working out of that specific location then it's like any job they are expected to come to work at that point. Now if I ask them to go to work at a different point, say the fellows that I have hired out of Lake Charles, I expect them to come to work because that's where they go to work at. But if I need them to go drive their personal vehicle say to Houston or to Beaumont or to some other terminal that I did not hire them to work out of then in that case we would pay them mileage and expenses.
Dowell testified that he was the dispatcher for Kennedy and that, after the day driver had finished his work mission in Martin Gas' truck, Kennedy would be informed to pick up that truck in the Lake Charles area. Dowell stated that Kennedy would then pick up a load of sulphur in Lake Charles and deliver it to the designated location. When Dowell was asked to explain the time shifts between a day driver and a relief driver, such as Kennedy, he responded:
[I]f a guy starts in the morning say he starts at eight o'clock this morning and he works until six clock [sic] tonight then the guy that is working the second shift [relief driver] will call and I will say your truck will be available at six. But now by the same token, the guy that goes to work at eight o'clock in the morning he is not going to be able to go to work until the guy that goes to work at six gets through. It is the same difference depending on the other to get through before he can begin his work period.
* * * * * *
Normally when I am slip seating people, I will start my day driver and I will started [sic] him at four or five o'clock in the morning, you know, so that he knows that he needs to start at four or five in the morning so that he can get through by four or five in the afternoon. And that allows a measure of regularity to each of their lives.
Bill Thompson testified, through deposition, that he was employed by Martin Gas as the terminal manager for the Baytown, Texas office. He stated that he was responsible for "the operation of my area which includes maintenance of the equipment, supervising the drivers, supervising the maintenance personnel, the office personnel, making sure that our trucks get from point A to point B when they're supposed to in a safe manner." Thompson noted that he was responsible for Martin Gas' trucking operations in the Lake Charles area. When Thompson was asked to explain Martin Gas' trucking operations, the following exchange took place:
Q. How did Martin Gas conduct its operations in the Lake Charles area insofar as trucks, where they would be located, that sort of thing?
A. Well, at the time we had three trucks in the Lake Charles area. They were parked at two different locations. They were dispatched out of Kilgore, Texas because our dispatcher was in Kilgore. The drivers would speak to the dispatcher generally the day before and get their loads and get on their truck and go where they're supposed to go.
* * * * * *
Q. Now, what type of arrangements would Martin Gas make as to the location of these trucks, where they would be stored?
A. Generally, weWell, to rephrase that. The plants that we hauled the sulphur out of in this area was in the Sulphur/Westlake area, Citgo/Conoco specifically. So because of the location of those plants, the trucks were placed either in Lake Charles or the Sulphur/Westlake area. That's where they were parked strategically located to these plants to minimize any dead heading that would be involved.
Q. And what does the term "dead head" mean?
A. Well, that means driving a truck empty to a location to pick up a load, *1200 maybe hauling it in the opposite direction, coming back and then driving it empty again back to where you parked it.
* * * * * *
Q. Another term has come up in the course of some of the depositions that have already been taken. The term I believe is "slip seating" or sometimes called "braking"?
A. Yes, sir.
Q. Can you tell us what that refers to?
A. That refers to two drivers driving the same truck, one driver generally works generally during the day. The other driver works at night. They say the day driver leaves at a specific time in the morning say six or seven in the morning makes his run, returns back to where the truck is parked ten hours later and then the slip seater or the relief driver would then get on the truck at that point and make his runs.
Thompson testified that he informed Kennedy that Kennedy would be working out of Lake Charles. Thompson also acknowledged that he knew that Kennedy lived in Jennings. However, Thompson further testified that Martin Gas did not reimburse Kennedy for his expenses traveling to and from work.
The hearing officer, in finding that Kennedy was not in the course and scope of his employment at the time of the accident, stated in part that:
In worker's compensation cases, the general rule of law is that accidents occurring while traveling to and from work are noncompensable. Though there are exceptions to this general rule, this Court finds that none are applicable in this case. This Court finds that the claimant, Robert Kennedy was not within the course and scope of his employment with Martin Gas Transportation, Inc. at the time of his vehicular accident in November, 1993. Mr. Kennedy was not furnished transportation to travel to and from the areas where he picked up the eighteen wheeler he drove to transport products. The company did not reimburse Mr. Kennedy for travel expenses; nor was Mr. Kennedy transporting tools, equipment, or other things to be used in performing the job. Mr. Kennedy would simply drive his own vehicle to the location where the eighteen wheeler was parked, park his vehicle, get into the company truck, make the designated run, return the truck to a specific designated area; then he would get back into his own vehicle and drive himself back to his home. At the time of the accident, Mr. Kennedy was working as a relief driver who had not been permanently or regularly assigned to a vehicle. This Court cannot speculate that since Mr. Kennedy was expected to become permanently assigned to a vehicle, then his injury should be compensable under workers [sic] compensation rules. Despite disputed testimony that Mr. Kennedy would ultimately get a truck to park near his home, the reality was that Mr. Kennedy was traveling from work at his own expense and this Court believes his employment relationship was suspended from the time he left the eighteen wheeler in route to his home until he would resume his work at some other time.
We note the extensive jurisprudence holding that an employee injured while traveling from work to home is not in the course and scope of employment and, therefore, not entitled to worker's compensation benefits. See, e.g., Tarver, 645 So.2d 796; Major Transports, Ltd. v. Courville, 493 So.2d 109 (La. App. 3 Cir.), writ denied, 497 So.2d 1014 (La.1986); Mitchell v. Pleasant Hill General Hospital, Inc., 491 So.2d 183 (La.App. 3 Cir.), writ denied, 493 So.2d 1223 (La.1986); Smith, 457 So.2d 868; Clinton, 422 So.2d 570; Jackson v. Justiss-Mears Oil Co., Inc., 420 So.2d 1238 (La.App. 3 Cir.1982). Further, we find that there was a reasonable factual basis in the record for the hearing officer to conclude that (1) Kennedy's accident falls squarely within the general rule that an employee traveling to and from work is not considered to be in the course and scope of his employment; and (2) the facts in this case do not fit within any of the jurisprudentially recognized exceptions to the general rule. Accordingly, we conclude that the hearing officer was not manifestly erroneous *1201 in finding that Kennedy was not in the course and scope of his employment at the time of his accident and, therefore, is not entitled to worker's compensation benefits.

DECREE
For the foregoing reasons, the hearing officer's decision is affirmed. Costs of this appeal are assessed against the plaintiff-appellant, Robert Kennedy.
AFFIRMED.
SAUNDERS, J., dissents and assigns written reasons.
SAUNDERS, Judge, dissenting.
Although their conclusions differ, both parties direct this court's attention to largely the same authority.
As a general rule, accidents which occur while an employee is traveling to and from work are not considered as having occurred during the course of employment and are therefore not compensable. This rule is premised on the theory that ordinarily the employment relationship is suspended from the time the employee leaves his work to go home until he resumes his work. However, this rule has been subject to a number of jurisprudentially established exceptions.
Yates v. Naylor Indus. Services, Inc., 569 So.2d 616, 619 (La.App. 2 Cir.1990), writ denied, 572 So.2d 92 (La.1991)
For example, the following is a non-exclusive list of well recognized exceptions to the rule:
1) If the accident happened on the employer's premises;
2) If the employee was deemed to be on a specific mission for the employer, such as making a trip in the interest of his employer's business or pursuant to his employer's order;
3) If the employer had interested himself in the transportation of the employee as an incident to the employment agreement either by contractually providing transportation or reimbursing the employee for his travel expenses;
4) If the employee was doing work for his employer under circumstances where the employer's consent could be fairly implied;
5) If the employee was hurt while traveling to and from one work site to another;
6) If the employee was injured in an area immediately adjacent to his place of employment and that area contained a distinct travel risk to the employee, also known as the threshold doctrine; and,
7) If the operation of a motor vehicle was the performance of one of the duties of the employment of the employee.

Michaleski v. Western Preferred Casualty Company, 472 So.2d 18 (La.1985); Hughes v. Gearhart Industries, Inc., 552 So.2d 717 (La.App. 1st Cir.1989), writ denied, 556 So.2d 1280 (La.1990); Justice v. Sylvester, 499 So.2d 590 (La.App. 5th Cir.1986), writ denied, 503 So.2d 491 (La.1987); Guidry v. Chevron U.S.A., Inc., 461 So.2d 625 (La. App. 1st Cir.1984); Smith v. A.I. U. Insurance Company, 457 So.2d 868 (La.App. 3d Cir.1984); Johnson v. Aetna Casualty & Surety Company, 387 So.2d 1340 (La.App. 1st Cir.1980), writ denied, 393 So.2d 746 (La.1980); Castille v. Sibille, 342 So.2d 279 (La.App. 3d Cir.1977), and Gardner v. Industrial Indemnity Company, 212 So.2d 452 (La.App. 1st Cir.1968).
Yates v. Naylor Indus. Services, Inc., 569 So.2d at 619-20. [Emphasis added.]
In support of his position, claimant relies on three cases, Orgeron v. McDonald, 93-1353 (La. 7/5/94), 639 So.2d 224; White v. Frenkel, 615 So.2d 535 (La.App. 3 Cir.1993); and Jackson v. Long, 289 So.2d 205 (La.App. 4 Cir.1974). In Orgeron, an employee's effort to return home after a fourteen day stint offshore was thwarted by an emergency reassignment by his employer. In White, a championship wrestler assigned to wrestling thirty matches in thirty-one days in far flung venues was deemed to be under the effective control of his employer. Finally, Jackson involved a worker hired by a temporary agency in connection with the clean-up following Hurricane Camille, "not just as a cook, but as a cook to be dispatched in accordance with the customer's order," Id. *1202 at 208, and transported with employer funds. Thus, Orgeron, White, and Jackson concerned employees whose employment risks encompassed the employee's transportation to the work site. In accord, Lay v. Non-Mag, Inc., 556 So.2d 1341 (La.App. 3 Cir. 1990) (employee equipped with beeper called out for special services, injured returning home, compensable for injuries arising from extraordinary circumstance).
The terms "arising out of and "in the course of contained in La.R.S. 23:1031 constitute a dual requirement. Although the two requirements cannot be considered in isolation from each other, a claimant is required to make at least some showing of both in order to receive benefits. "Arising out of suggests an inquiry into the character or origin of the risk giving rise to the injury. Raybol v. Louisiana State University, 520 So.2d 724 (La.1984).
Mitigating against workers' compensation coverage, on the other hand, is the argument that the risks which caused injuries to the claimant were no greater than the risks of commuting everyone faces while traveling to and from work every day, risks generally beyond the scope of the Workers' Compensation Act. This theory rests on defendant's argument that claimant was off-duty at the time of the accident, an argument the employer supports with its observation that it neither provided claimant's transportation nor reimbursed claimant for his travel expenses. Such factor, defendants properly point our, would tend to suggest that claimant was not in the course and scope of his employment at the time of his accident. See, e.g., Tarver v. Energy Drilling Co., 26,233 (La.App. 2 Cir. 10/296/94), 645 So.2d 796 (claimant lived 210 miles from job site); Major Transports, Ltd., v. Courville, 493 So.2d 109 (La.App. 3 Cir.), writ denied, 497 So.2d 1014 (La.1986) (claimant injured returning home from land rig denied benefits although partly compensated for transportation); Mitchell v. Pleasant Hill General Hosp., Inc., 491 So.2d 183 (La.App. 3 Cir.), writ denied, 493 So.2d 1223 (La.1986) (nurse injured returning home 28 miles from work denied benefits although received partial travel allowance.)
In each of these cases, the employer could maintain that a finding of coverage would not only be inequitable and out of sync with the raison d' etre for workers' compensation, compensation for injuries sustained by the employee in pursuit of his employer's objectives, but an undue burden on the court system. Indeed, this position is not without support. In the absence of extraordinary risk, the usual rule is that the risks of commuting to and from work is not the sort of risk envisioned by workers' compensation: "[A]n employee's place of residence is a personal decision not directly controlled by the employer, and treating commuting time as part of the determination of course and scope of employment would remove manageable boundaries from the determination." Orgeron, 639 So.2d at 227. But this general rule permits some exception, particularly in circumstances where the risks of injuries to the employee are occasioned less by the employee's choice of domicile than by his employer's decision to operate without fixed work locations to which its employees may commute and around which they may organize their lives. As the Supreme Court stated in Orgeron, 639 So.2d 224:
When an employee is required to check in at a certain place and is then dispatched to the work site for that day, he is generally in the course of employment in the travel between the check in place and the work site, but not between home and the check in place. See generally Arthur Larson, Law of Workman's Compensation Sec. 16 (1993). However, when an employee is instructed to report to different work sites which change periodically, without first reporting to a check in place, there are more variations in the determination of course and scope of employment.
Orgeron, 639 So.2d at 227. [Emphasis ours.]
Here, we are confronted by the latter circumstance, as the claimant truck driver was assigned to answer his employer's call on a twenty-four hour basis and respond to any of several points of rendezvous.
More importantly, the facts suggest that the risks of claimant's being injured were created more by his employer's requirements of his employment than by any other cause. *1203 Claimant, by occupation a driver, was required by his employment to report with little or no notice to any of various rendezvous points to pick up his employer's tractor-trailers, a modus operandi chosen by his employer, for its own convince. This logistical decision by defendant, although perfectly justifiable from a business standpoint, was not without some cost to its employee: an irregular sleep and rest schedule and a surplus of travel distance and time. Thus, the following factors tend to distinguish the plaintiff in the present case from the typical 9 to 5 employee whose trip to and from work is not considered to be in the course and scope of his employment:
(1) The plaintiff is a truck driver and as such, the "risk of the road" is part and parcel of his employment.
(2) His employment subjects him to being called out at varying and unpredictable time, thus increasing the "risk of the road" to which his trade subjects him;
(3) His employment subjects him to being called out at odd (late) hours, thus requiring night driving in a predictably fatigued state, thereby further increasing the "risk of the road;"
(4) His employment further requires the plaintiff to report to multiple locations, negating his ability to minimize his transportation hazards by relocating closer to a given permanent work location.
I would find coverage in this case because these enhanced dangers were requirements of employment that contributed to an elevated risk of injury to claimant while in the course and scope of employment, thus distinguishing the sort of travel risks encountered by the typical work-a-day employee. Just as importantly, the fact that these extraordinary travel risks did not emanate from claimant's logistical decision of where to live, but from his employer's logistical decision to maintain fewer offices in close proximity to its customers, defeats any equitable "place of residence" defense.
The theory of workers' compensation rests upon the sound economic principle that those persons who enjoy the product of a business, initially the vendor of goods or services but ultimately their consumer, should bear the costs of production. Some production costs are associated with human losses, which like other production costs can be anticipated and passed along in minute increments in the form of workers' compensation premium costs. Malone & Johnson, Workers' Compensation, Sec. 32, 13 Louisiana Civil Law Treatise (3d Ed.1994)
For the foregoing reasons, I respectfully dissent.