510 So.2d 82 (1987)
Mr. Joseph DEAN and Mrs. Vernell Dean
v.
TERREBONNE PARISH POLICE JURY.
No. 86 CA 0725.
Court of Appeal of Louisiana, First Circuit.
June 23, 1987.
*83 Kerry Shields, New Orleans, for plaintiffs and appellants, Joseph and Vernall Dean.
Jerry L. Hermann, Houma, for defendant and appellee, Terrebonne Parish Police Jury.
Before SAVOIE, CRAIN and LeBLANC, JJ.
SAVOIE, Judge.
This is a personal injury suit for damages sustained in a slip and fall accident. Mrs. Vernell Dean (plaintiff) named as defendants the Terrebonne Parish Police Jury, now known as the Terrebonne Parish Consolidated Government (the Parish), and its insurer, United Fire and Casualty Insurance Company (United Insurance). Mr. Joseph Dean, plaintiff's husband, filed a claim for loss of consortium. The action against the Parish was tried solely by the judge, while United Insurance was subject to trial by jury during the same trial on the identical facts and issues. The jury found the Parish to be at fault and rendered a verdict in favor of plaintiff. However, the judge found the Parish free of fault and rendered judgment notwithstanding the verdict in favor of defendants and against plaintiff.
The alleged accident occurred on August 11, 1983. Plaintiff was about to exit the Terrebonne Parish Courthouse annex building when she slipped and fell near the Church and School Street exit. Plaintiff alleges that as a result of the fall she suffered substantial injuries, which later required a laminectomy. Thereafter, plaintiff filed this action alleging the fall was caused by the Parish's negligence in allowing water to remain on the floor near the doors.
The case went to trial before Judge Timothy C. Ellender and a six-member jury on October 2, 1985. At trial the following testimony was heard.

Testimony
Mrs. Dean testified that on August 11, 1983, she went to the food stamp office at the courthouse annex. She was wearing flip flop sandals at the time. Joseph Pellegrin, a friend, had given her a ride to the courthouse from Dulac and Eula Trahan, plaintiff's sister, accompanied them. She testified that at the time they left Dulac it was raining, but that it had stopped by the time they reached the courthouse. Mrs. Dean and Mr. Pellegrin left Mrs. Trahan waiting in the car while they went into the courthouse through the entrance at the corner of Church and School Streets. After getting her food stamps, she proceeded to the School Street entrance. Mr. Pellegrin walked a few steps behind her as they headed toward the entrance.
Mrs. Dean testified that when she was approximately three to four feet from the entrance, her right foot slipped. She fell down on her left knee, twisting her back as she fell. Mrs. Dean testified that she did not know what was on the floor. She stated that the floor was clear and shiny and that it was "sort of damp". Mrs. Dean stated that after getting into the car she noticed that her pants were wet at the knee. Mrs. Dean testified that she saw no "wet floor" signs near the entrance where she fell and that she could not remember if there was a floor mat at the entrance.
Mr. Pellegrin, plaintiff's eyewitness, testified that he saw Mrs. Dean fall approximately four feet from the entrance and *84 that the floor was shiny. However, he did not see any foreign object on the floor, nor did he see any liquid on the floor. He testified that he could not tell if the floor was wet or dry, but he did see a brownish skid mark on the floor where Mrs. Dean had fallen. Mr. Pellegrin did not see any floor mat at the entrance.
After Mrs. Dean's fall, Mr. Pellegrin helped her to a bench and went for assistance to the police jury insurance office. Deena Jaccuzzo Rodrigue, an insurance clerk, accompanied Mr. Pellegrin back to the accident scene. Mrs. Rodrigue testified that there was no foreign object of any kind on the floor and that the floor was completely dry. Neither Mrs. Dean nor Mr. Pellegrin told her that there was water on the floor. She was positive that there was a floor mat at the entrance but stated there was no "wet floor" sign. Mrs. Rodrigue did notice a black skid mark on the floor where Mrs. Dean had fallen.
After the fall Mrs. Dean left the courthouse in Mr. Pellegrin's car. Mrs. Eula Trahan testified that she noticed when Mrs. Dean got into the car that her pants leg was wet at the left knee. She testified that Mrs. Dean told her about the fall but that she had not mentioned falling or slipping on anything.
Lance Duplantis, the buildings and grounds superintendent for the parish, and Norman Payne, the night janitor foreman, testified regarding maintenance of the courthouse floors. The overall responsibility for maintenance of the courthouse belongs to Mr. Duplantis whose working hours are from 7:30 a.m. to 4:30 p.m. Mr. Payne, who worked from 3:30 p.m. to midnight, was in charge of the night crew. Since most of the maintenance and general cleaning of the courthouse was done at night after the building was closed to the public, Mr. Payne was chiefly responsible for cleaning and maintaining the floors in the courthouse annex.
According to Mr. Duplantis, the terrazzo floors of the courthouse annex were treated with Metalist floor finish which was used to preserve the floor, give it a shiny appearance, and to provide a slip resistant surface. Standard maintenance procedures established by the Parish involve stripping and resealing the floors once a year. According to Parish records, the floor had been stripped and resealed in October of 1982. Mr. Duplantis testified that, in addition to the yearly stripping and resealing, he directed that the floors be spray buffed at least once a month. This spray buffing was designed to keep up the shine on the floor and increase the skid resistance of the floor. The Parish kept records of each spray buffing only when it was done outside the employees' regular working hours. These records were kept only for purposes of overtime payment for the Parish employees. According to Parish records, the annex floors were spray buffed on July 4, 1983.
Mr. Payne, the night foreman, testified that he did the floor maintenance work in the courthouse annex. According to Mr. Payne, he tried to spray buff the floors once a week. He wet mopped the floors approximately three times a week. In the interim, the floors were dust mopped and spot mopped as needed. Since no complete records of spray buffing were kept, Mr. Payne could not testify how many times, if any, that the floors were spray buffed between July 4, 1983 and the date of the accident. He did admit that there were times when the floors were not spray buffed for more than a month. However, he testified that, even if the floors had not been spray buffed for five weeks, they would not have been slippery or unsafe.
According to Mr. Duplantis, daily maintenance of the courthouse begins when the day shift unlocks the doors and picks up the "wet floor" signs left out by the night crew. Cleaning of the floors during the day is performed on an as-needed basis. Mr. Duplantis' crew is instructed to immediately clean up anything they see on the floor. Mr. Duplantis testified that on rainy days the public does track in some rain water on their feet, rain gear, and umbrellas. The standard procedure employed on rainy days calls for the yard man to leave his duties immediately when rain begins and to place "wet floor" signs at all of the *85 entrances. James Stoves, one of the janitorial crew whose responsibility it is to clean up spills around the courthouse, is instructed to check the entrances for water on rainy days whenever he is not involved in performing his other duties.
Mr. Duplantis further testified that each entrance has an all-weather mat on the floor inside the door at all times. The large mats measure 4' x 10' and the small ones measure 4' x 6'2". It was not established which size mat was used for the entrance at Church and School Streets. The mats are usually cleaned at night. On occasions when the mats need cleaning during the day, a spare mat is placed at the entrance while the soiled mat is being cleaned.
On the day of the accident, Mr. Duplantis was not at work. A three man crew was on the job that day. An assistant to Mr. Duplantis was in charge in Mr. Duplantis' absence. He was not called to testify at trial.
Thomas Whitney, an architect, testified that terrazzo has been used as a floor material for centuries. Because terrazzo flooring is permanent and durable it is often used in public buildings. Mr. Whitney inspected the floor in the courthouse annex and found it to be in good shape and a safe walking surface.
George Pappas, accepted as an expert in the field of chemical engineering, safety, and in the field of establishing the coefficients of friction of various objects, tested the courthouse annex floor at the Church and School Street entrance on August 23, 1985. He considered the floor a safe walking surface, having a coefficient of friction in excess of .5. He also felt that the maintenance procedures used by the courthouse personnel were appropriate. Mr. Pappas tested the floor dry and did not know how long it had been since the floor had last been spray buffed prior to his test. According to Mr. Pappas, the flip flops that Mrs. Dean was wearing were designed for beach wear rather than normal use. He stated that, assuming that the floor was free of foreign substances, the probable cause of Mrs. Dean's fall was her unstable footwear.
At the conclusion of the trial, the jury returned a verdict in favor of plaintiff and against the Parish, finding Mrs. Dean to have suffered $104,313.00 in damages. However, the jury assigned 22% of the fault ot Mrs. Dean. The award was reduced by her percentage of fault, resulting in an award of $81,364.14, plus legal interest and court costs. The jury awarded no recovery to Mr. Dean. Thereafter, the trial judge rendered his judgment in favor of the Parish, finding no negligence on the part of the Parish.
United Insurance then filed a motion to reconcile the verdict, motion for judgment notwithstanding the verdict, and motion for new trial. In a judgment and reasons for judgment dated January 22, 1986, the trial court granted the defendant's motions for judgment notwithstanding the verdict and for reconcilation of the jury verdict with that of the trial judge. The court rendered judgment in favor of United Insurance, dismissing plaintiff's claims at her cost. The trial court also conditionally granted United Insurance's motion for new trial, in the event the judgment was vacated or reversed on appeal. It is from this judgment that plaintiffs appeal.
On appeal plaintiffs raise the following specifications of error:
1. The trial court erred by granting defendant's motion for judgment notwithstanding the verdict, motion to reconcile the verdict with the judgment of the trial court, and conditionally granting the motion for new trial.
2. The trial court erred as a matter of law when it rendered judgment in favor of defendants, and against plaintiff, on the facts presented before the court.
3. The judgment of the trial court unconstitutionally denied plaintiff her right of trial by jury against United Insurance.

Motions
Plaintiffs contend that the trial court erred by granting United Insurance's motion for judgment notwithstanding the verdict, motion to reconcile, and motion for *86 new trial. We find this assignment without merit.
Initially, we point out that LSA-R.S. 13:5105, which prohibits jury trials against the state, a state agency, or a political subdivision, does not apply to the libility carrier of a political subdivision, even when they are joined in the same action and there exists identity or substantial similarity of issues against both. Jones v. City of Kenner, 338 So.2d 606 (La.1976); Champagne v. American Southern Insurance Co., 295 So.2d 437 (La.1974). In Jones and Champagne our supreme court made it clear that when a public defendant (the Parish) and a private defendant (United Insurance) are joined for trial, there is to be one trial with the jury deciding issues as to the nongovernmental defendant and the judge as to the governmental defendant. Accordingly, the trial court properly ordered a bifurcated trial in the instant case as authorized by LSA-C.C.P. art. 1736.[1]
The issue as to the Parish, a governmental entity, is liability. No independent fault has been alleged on the part of United Insurance. The insurer cannot be cast in judgment unless and until the governmental entity is found at fault, and this cannot be done by a jury. The issue of liability must be determined by the judge alone. Champagne, supra at 439; Jones, supra at 608; LSA-R.S. 13:5105.
In the case sub judice, the trial judge found no liability on the part of the Parish, while the jury found the Parish 78% at fault. In order to reconcile the two verdicts, the trial judge rendered a judgment notwithstanding the verdict in favor of the Parish and against plaintiff. We find that this procedure utilized by the trial court was proper.
In Champagne, supra at 439, our supreme court stated:
The possibility of different decisions on the same point by judge and jury should not affect the decision in this case. The judge already has the power to set aside a jury decision with which he is not in accord, C.C.P. Arts. 1812, 1813 [now C.C.P. art.'s 1813, 1814]; and appellate courts have the right to review findings of fact of both judge and jury, La. Const. Art. 7, § 29.
Our supreme court followed this reasoning in Jones, supra at 608, and in Lemire v. New Orleans Public Service, Inc., 458 So.2d 1308 (La.1984). In Lemire the court stated that when the verdicts of the judge (as to the governmental defendant) and jury (as to the nongovernmental defendant) differ, "the disparity can be accommodated by a judgment notwithstanding the verdict and/or motion for new trial."
As a matter of law, the jury had neither the right nor the duty to determine the issue of fault as to the Parish, much less to assign percentages of fault. LSA-R.S. 13:5105 prohibits a jury trial of a suit against the state, a state agency or a political subdivision. Therefore, the jury's verdict had no weight on the issue of the fault of the Parish. Since the jury had no power to adjudicate the issue of fault in this case, there can be no conflict between the verdict of the judge and that of the jury as to the issue of fault.[2]See Lemire, supra at 1310; Rogers v. Calcasieu Parish Police Jury, *87 487 So.2d 190, 192 (La.App. 3rd Cir.), writ denied, 489 So.2d 924 (La.1986); Bishop v. Shelter Insurance Co., 461 So.2d 1170, 1174 (La.App. 3rd Cir.1984), writ denied, 465 So.2d 737 (La.1985). Accordingly, we need only apply the manifest error rule in our appellate review of the factual findings of the trial judge.

Trial Court's Findings
Initially, plaintiffs contend that the trial court committed manifest error by finding no negligence on the part of the Parish. We find this argument without merit.
In his written reasons for judgment, the trial judge found "nothing defective or dangerous about the floor itself" and that "the floor was dry and free of any foreign object." Therefore, the trial court concluded that plaintiffs have "failed to establish that her fall was caused by negligence on the part of the defendant or that it resulted from some premise defect for which [T]he Parish would be responsible." The trial court's finding is entitled to great weight and cannot be disturbed absent a finding of manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
In his reasons for judgment, the judge stated that he believed the testimony of Mrs. Rodrigue that the floor was dry. The trier of fact should assess the credibility of witnesses to determine the most credible and realistic evidence, and his evaluation of expert and lay testimony will not be disturbed unless found to be clearly wrong. Holmes v. Southeastern Fidelity Insurance Co., 422 So.2d 1200 (La.App. 1st Cir. 1982), writ denied, 429 So.2d 133 (La.1983); Arceneaux v. Domingue, supra at 1333. After a careful review of the record, we cannot say that the trial court was clearly wrong.

Right to Trial By Jury
Finally, plaintiffs contend that the judgment of the trial court unconstitutionally denied plaintiffs their right of trial by jury against United Insurance. This assignment lacks merit.
We held earlier that the trial court properly ordered a bifurcated trial in which the issue of liability was before the judge and all other issues as to United Insurance were before the jury, i.e., coverage or possibly the policy limits as to such coverage.[3] However, as the judge found no liability on the part of the Parish, there were no issues remaining relevant to its insurer, as no fault on the part of United Insurance was alleged. To hold otherwise, i.e., to allow the jury to determine the issue of fault as to the Parish, would be in violation of LSA-R.S. 13:5105 which has withstood a barrage of constitutional attacks. See Rudolph v. Massachusetts Bay Insurance Co., 472 So.2d 901 (La.1985).
For the above and foregoing reasons, we affirm the judgment of the trial court. All costs of this appeal are to be paid by appellants.
AFFIRMED.
NOTES
[1] Art. 1736. Trial of less than all issues; stipulation

The trial of all issues for which a jury trial has been requested shall be by jury, unless the parties stipulate that the jury trial shall be as to certain issues only or unless the right to trial by jury as to certain issues does not exist; however, except as otherwise provided under the provisions of Article 1562, there shall be but one trial. Added by Acts 1983, No. 534, § 1. (Emphasis ours).
[2] We find it an exercise in futility to impanel a jury in cases such as this where the only private (nongovernmental) defendant is the insurer of the public (governmental) defendant and there is no independent fault alleged against such insurer. The liability, if any, of the insurer depends solely on a finding of fault on the part of the public defendant, which must be determined by the judge alone. Further, we believe the issue of quantum must be tried solely by the judge. To allow a jury to award damages would defeat the intent of LSA-R.S. 13:5105, which is to prevent the jury's inclination to dig deeper into state pockets. See Rudolph v. Massachusetts Bay Insurance Co., 472 So.2d 901 (La.1985). Therefore, unless there exists an issue as to coverage or the policy limits as to such coverage, the jury would serve no purpose as liability and quantum must be left to the judge alone.
[3] Id.