834 So.2d 578 (2002)
Lillie MADISON, Edward Madison, III and Thaddeus I. Madison
v.
ERNEST N. MORIAL CONVENTION CENTER-NEW ORLEANS, New Orleans Public Facility Management, Inc., Ernest N. Morial New Orleans Exhibition Hall Authority, the City of New Orleans and Zulu Social Aid and Pleasure Club, Inc.
Lillie Madison, Edward Madison, III and Thaddeus I. Madison
v.
Ernest N. Morial Convention Center-New Orleans, New Orleans Public Facility Management, Inc., Ernest N. Morial New Orleans Exhibition Hall Authority, the City of New Orleans and Zulu Social Aid and Pleasure Club, Inc.
Nos. 2000-CA-1929, 2001-CA-1127.
Court of Appeal of Louisiana, Fourth Circuit.
December 4, 2002.
*580 Clifford E. Cardone, Catherine Hilton, Cardone Law Firm, a PLC, New Orleans, LA, for Plaintiffs/Appellees.
Stephen N. Elliott, Ann M. Sico, Bernard, Cassisa, Elliott & Davis, Metairie, LA, for Ernest N. Morial Convention Center New Orleans, et al.
Terese M. Bennett, Gregory C. Weiss, Julie G. Hamner, Weiss & Eason, L.L.P., New Orleans, LA, for Administrators of the Tulane Educational Fund.
*581 (Court composed of Chief Judge WILLIAM H. BYRNES III, Judge PATRICIA RIVET MURRAY, Judge JAMES F. McKAY III).
WILLIAM H. BYRNES III, Chief Judge.
[1]The plaintiffs, the family of Edward Madison, Jr., filed a wrongful death and survival malpractice action in connection with the collapse from an apparent heart attack on February 12, 1994, and ensuing death a few minutes later of Edward Madison, Jr. He was fifty-five years old at the time and was attending the Zulu Social Aid and Pleasure Club Ball at the Earnest N. Morial Convention Center. Named as defendants were the City of New Orleans/ Emergency Medical Services (the "City"), the Ernest N. Morial Convention Center (the "Convention Center"), the New Orleans Public Facility Management, Inc. (managers of the Convention Center), and the Zulu Social Aide and Pleasure Club. All of the foregoing defendants may hereinafter be referred to collectively as the "Convention Center Defendants." Jo Deason ("Nurse Deason"), the nurse on duty at the Convention Center that night, and her employer, The Administrators of the Tulane Educational fund d/b/a Tulane University Health Sciences Center f/d/b/a Tulane University Hospital and Clinic ("Tulane") were also named as defendants in addition to the Convention Center defendants. Tulane does not dispute its liability for the actions of Nurse Deason should she be found liable.
There was a bifurcated trial with the judge determining the claim against the City, and the jury deciding the claim against the remaining defendants. The jury rendered a verdict in favor of the plaintiffs and against the defendant, Tulane. Pursuant thereto, a judgment of the trial court was signed awarding the plaintiffs $792,000.00[2] "together with interest from date of demand, reasonable expert fees and for all costs of these proceedings, subject to the limitations and benefits of La. R.S. 1299.41, et seq." It was further ordered that there be judgment in favor of the New Orleans Public Facility Management, Inc. and the Zulu Social Aid and Pleasure Club, dismissing plaintiffs' claims against those defendants, with prejudice "at plaintiffs' costs." Along the way, defendant motions for a directed verdict and for a JNOV were denied. Tulane's order of suspensive appeal was signed on May 11, 2000.
The judge dismissed the claim against the City for the alleged negligence of the EMS crew. All fault was assigned to Tulane. The plaintiffs appeal of the dismissal of their claim against the City has been separately dismissed.
On June 13, 2000, the Convention Center Defendants filed a motion to assess costs against Tulane, seeking $58,000.00 in attorney's fees pursuant to an indemnification provision in the contract between Tulane and New Orleans Public Facilities Management, Inc. The trial court granted the motion of the Convention Center Defendant on March 5, 2001. Tulane's appeal from this judgment has been consolidated with the appeal on the merits. The Convention Center Defendants answered Tulane's *582 appeal asking for damages for frivolous appeal and costs.
I. JUDGMENT OF MARCH 5, 2001
We shall take up the judgment on the motion to assess costs against Tulane first for the sake of simplicity.
LSA-C.C.P. art.2088(10) provides that the trial court retains jurisdiction to tax costs. We find that this is true even where the appellant takes a suspensive appeal. However, the jurisdiction retained is limited to taxing costs consistent with the judgement. In the instant case, the original judgement ordered that "the plaintiffs ... bear the costs of the New Orleans Public Facility Management, Inc. and the Zulu Social Aid and Pleasure Club. Therefore, it was error for the trial court to subsequently tax costs to Tulane. We adopt the reasoning of the First Circuit in Miley v. U.S. Fidelity and Guaranty Co., 94-1204 (La.App. 1 Cir. 4/7/95), 659 So.2d 792, 799:
We first note that the trial court's judgment awarded all costs to the defendant. That award of costs is "reviewable under the appeal" by this court, C.C.P. art. 2088, and the trial court therefore lost jurisdiction over it (save to "set and tax", meaning to fix their amount and to decide whether or not collectible from the party cast for costs). To the extent that the trial court's second judgment, on the rule to tax (C.C.P. art.1920), cast defendant for, or denied defendant, taxable costs (such as jury costs and the reasonable costs of experts who testified at trial, but not of those who did not, nor of depositions not there introduced, R.S. 13:4533), it amounts to a partial reversal of the first judgment's award of all costs to defendant, and it is therefore null for lack of jurisdiction. [Emphasis added.]
LSA-C.C.P. art.1951 permits the amending of a final judgment of the trial court only to alter the phraseology (but not the substance) or to correct errors of calculation. Neither situation applies to the instant case. The taxing of costs to Tulane after already having cast the plaintiffs for costs amounts to a substantive amendment to the judgment, which may only be done pursuant to a timely application for a new trial or a timely appeal. State v. Star Enterprise, 95-2124 (La.App. 4 Cir. 8/7/96), 691 So.2d 1221.
For the foregoing reasons, the judgment of the trial court of March 5, 2001, is reversed. By finding as we have held for the appellant in this appeal, the Convention Center Defendants' answer to the appeal urging that it is frivolous is, per force, rejected.
II. THE JUDGMENT ON THE MERITS
This is basically a manifest error case, hinging on the resolution of conflicting testimony fact witness and expert witnesses.
The essence of plaintiffs' claim against Nurse Deason and her employer, Tulane, is that Nurse Deason, having been specially trained in Advanced Cardiac Life Support (ACLS) was negligent when she went to the decedent's aid in failing to bring with her or immediately call for the portable heart monitor/defibrillator which she had with her in the medical room a mere 70 feet away from the decedent's table at the festivities; and that this negligence was a substantial cause of the decedent's death and/or the cause of his loss of "chance of survival."[3]
*583 As far as the time line of events, the parties are basically in agreement with everything from the moment Nurse Deason received the emergency call of "man down" at 2:05 a.m. The plaintiffs and defendants also agree that Nurse Deason arrived at the decedent's side in response to the emergency summons at 2:07 and that she called for an ambulance at 2:08 a.m. The main bone of contention between the parties as to the issue of timing is how much time elapsed between the time the decedent collapsed until the time Nurse Deason was summoned. The plaintiffs do not contend that Nurse Deason failed to respond promptly to the call of "man down." The plaintiffs contend that she was summoned almost immediately, within a minute or two of the collapse, right after 2:00 a.m. and that she responded promptly. The defendants contend that the collapse occurred much earlier and that by the time Nurse Deason was summoned it was too late for her to be of any assistance.
The defendants base their contention that the decedent collapsed earlier in the evening on the testimony of Mrs. Madison, the decedent's wife, that her husband collapsed shortly after 1:05 a.m., and the EMS report which reflects that at 2:17 a.m. the decedent had fixed and dilated pupils, indicating that he had been brain dead for at least half an hour. From these factors, defendants argue that by the time Nurse Deason arrived at 2:07 a.m., no chance of survival remained to the decedent. Naturally, if the decedent had no chance of survival when Nurse Deason arrived, then any negligence on her part could not have been a cause in fact of any damages claimed on behalf of the decedent or by the plaintiffs.
As to Mrs. Madison's testimony, it seems likely that she was just an hour off in her recollection or that she misspoke. It is not reasonable to assume that for approximately an hour no one called for an ambulance or some kind of emergency assistance. There is nothing in the testimony of any other witness, either fact or expert, from which it could be inferred that the decedent's collapse occurred any where near as early as 1:05 a.m.
Likewise, the fact finder did not have to accept at face value the vague and uncertain testimony of Dr. Hightower that he may have attempted to administer first aid assistance to the decedent for perhaps as long as 15 to 30 minutes before Nurse Deason arrived. Even if this were a de novo review, this Court would find that the most reasonable inferences to be drawn from the record as a whole coincide with the timeline propounded by the plaintiffs and adopted explicitly by the trial judge and implicitly by the jury.
As to the defendants contention that the decedent was already brain dead when Nurse Deason arrived, the defendants argue in brief that:
The only evidence [that] Mr. Madison even had a pulse between the time Nurse Deason arrived and the EMS arrived is the testimony of Dr. Hightower, who said he had a pulse for approximately thirty seconds, the entire time he worked to resuscitate the man.
However, Nurse Deason testified that:
The pulse and respiration were present when I arrived on the scene. I did not stop and count a full minute of respirations nor a full minute of pulse, I did not do that.
*584 Dr. Michael Magoon was qualified as an expert for the plaintiff in emergency medicine protocol and pre-hospital standard of care. He is an Advanced Cardiac Life Support (ACLS) instructor and has other impressive qualifications in the ACLS and pre-hospital care fields. He testified that, "more probable than not [the decedent] did not have a cardiac arrest at 1:35 and suddenly get a pulse back at 2:07 with basic CPR." Following Dr. Magoon's timing, as supported by Nurse Deason's testimony, it is unlikely that the decedent had been brain dead for thirty minutes prior to 2:17 a.m. Dr. Magoon also testified that Nurse Deason should have brought the defibrillator with her when she responded to the call of "man down." Dr. Magoon also noted that Nurse Deason's report did not indicate that water prevented her from defibrillating, an issue addressed below.
Thus, viewing the record as a whole, we would have to say that a reasonable fact finder could conclude that the decedent had a reasonable chance of survival with a reasonable quality of life when Nurse Deason arrived at 2:07. The fact that on this issue the record would have also permitted a reasonable fact finder to draw contrary inferences more favorable to the defense, does not permit this Court to find that the jury was manifestly erroneous in implicitly drawing reasonable inferences favorable to the plaintiffs in this regard.
Yolanda Lacoix, another nurse who happened to be present on the scene, could not recall the exact timing, but one can infer from her testimony both that she also detected a pulse in the decedent immediately before Nurse Deason arrived on the scene and, contrary to the position argued by the defendants, that Nurse Deason arrived on the scene only a couple of minutes after the decedent went down:
A. Well, I remember hearing the noise, I was with several family members and I saw a man had fallen back out of a chair and he was lying on the floor on his back.
Q. Since you were attending the ball, you were there as a guest?
A. Yes.
Q. Did you know this person?
A. No.
Q. What did you do next?
A. Well, I kneeled down beside him and took his pulse and I remembered him having a pulse. I don't remember how fast or slow but at the same I kneeled down there was another gentlemen that kneeled down on the other side and was taking his pulse on the other side. He told me he was an EMT.
After that they had a lot of commotion and somebody in the crowd there was a female that came and somebody said she was a physician [ (a fact finder could reasonably infer that this was Nurse Deason because she was attired in medical garb and there is no record of any other female doctor on the sceneand that is the inference that this court would draw de novo) ], somebody in the crowd, but I don't know if she was, then I stood up and the other gentleman stayed there and I kind of stepped back and I remember, I don't know how long it was but they started CPR on him.
The sequence of events described by Robert Royal, a food service supervisor, relative to the time CPR was commenced also permits the reasonable inference that Nurse Deason was summoned to the scene promptly after the decedent went down, not half an hour or more as suggested by the defendants.
Tulane makes the excellent argument that if the presence of water on the floor prevented the use of a defibrillator by the *585 EMS crew, as was found to be the case, by the trial judge in its reasons for judgment, it would have equally prevented the use of the defibrillator by the Nurse Deason. Therefore, if the EMS crew was not negligent, then Nurse Deason for the same reason is also not negligent. Conversely, if Nurse Deason was negligent, then the EMS crew was also negligent. If the only issue were the wetness of the floor this argument would be compelling. However, even if the floor wasn't wet, the record would support the finding of the jury attributing negligence and causation to Nurse Deason while simultaneously supporting the trial judge's finding that the EMS crew was not negligent and/or that the negligence of the EMS crew did not contribute to the decedent's death. This is because by the time the EMS crew arrived on the scene, the decedent's chance of survival dropped virtually to zero, even assuming that defibrillation had been administered immediately. At that point any negligence by the EMS crew would not have contributed to causation, regardless of whether we adopt the timing suggested by the defendants or that suggested by the plaintiffs. In other words, even were we to apply a de novo standard of review, because of the erroneous finding of wetness by the trial judge, we would assign no liability to the EMS crew.
This apparent inconsistency raises a novel question: In a bifurcated trial, when the results reached by the judge and jury are consistent, but those results are based on what may be an inconsistency in underlying findings, what is the effect and what standard of review should be employed?[4] In this regard, this Court has conducted an exhaustive review of all bifurcated trial cases in Louisiana going back approximately twenty years. Those that might have any even remote relevance at all to the instant case are the following: Breaux v. Touchet, XXXX-XXXX (La.App. 3 Cir. 6/26/02), 821 So.2d 774; Mossy Motors, Inc. v. Sewerage and Water Bd. of City of New Orleans, 98-0495 (La.App. 4 Cir. 5/12/99), 753 So.2d 269; Edwards v. Daugherty, 97-1542 (La.App. 3 Cir. 3/10/99), 729 So.2d 1112; Griffin v. International Ins. Co., 98-431 (La.App. 3 Cir. 10/7/98), 727 So.2d 485; Wyatt v. Red Stick Services, Inc., 97-1345 (La.App. 3 Cir. 4/1/98), 711 So.2d 745; Eppinette v. City of Monroe, 29,366 (La.App. 2 Cir. 6/20/97), 698 So.2d 658; Hasha v. Calcasieu Parish Police Jury, 94-705 (La.App. 3 Cir. 2/15/95), 651 So.2d 865; Dowden v. Mid State Sand & Gravel Co., Inc., 95-231 (La.App.11/2/95), 664 So.2d 643; Cornish v. State, Dept. of Transp. and Development, 93-0194 (La.App. 1 Cir. 12/1/94), 647 So.2d 1170[5]; Randolph v. General Motors Corp., 93-1983 (La.App. 1 Cir. 11/10/94), 646 So.2d 1019; Buffinet v. Plaquemines Parish Com'n Council, 93-0840 (La.App. 4 Cir. 7/27/94), 645 So.2d 631; Richard v. Teague, 92-17 (La.App. 3 Cir. 5/4/94), 636 So.2d 1160; Longman v. Allstate Ins. Co., 93-0352 (La.App. 4 Cir. 3/29/94), 635 So.2d 343; Gilbert v. Laborde, 93-761 (La.App. 3 Cir. 2/2/94), 632 So.2d 1162; Ourso v. Grimm, 92-1274 (La.App. 3 Cir. 1/5/94), 630 So.2d 963; Carr v. City of New Orleans, 626 So.2d 374 (La.App. 4 Cir.1993); Haydel v. Commercial Union Ins. Co., 617 So.2d 137 (La.App. 5 Cir.1993); Smith v. *586 City of New Orleans, 616 So.2d 1262 (La. App. 4 Cir.1993); Stapleton v. Great Lakes Chemical Corp., 616 So.2d 1311 (La.App. 2 Cir.1993)[6]; White v. Frenkel, 615 So.2d 535 (La.App. 3 Cir.1993); Morales v. Tetra Technologies, Inc., 608 So.2d 282 (La.App. 3 Cir.1992); American Cas. Co. v. Illinois Cent. Gulf R. Co., 601 So.2d 712 (La.App. 5 Cir.1992); McCullough v. Regional Transit Authority, 593 So.2d 731 (La.App. 4 Cir.1992).
In this last case, McCullough, this Court also did an exhaustive survey of the jurisprudence as it existed at that time because of the conflict between the circuits as to what standard of review to apply where there is inconsistency between the findings of the jury and the findings of the judge in bifurcated trials, a conflict which in the many years since McCullough the Supreme court has declined to resolve in any definitive manner. Apparently the problem arises because of the different ways in which the circuits read Thornton v. Moran, 343 So.2d 1065 (La.1977), where the Supreme Court reversed and remanded to the court of appeal with instructions "to resolve the differences in the factual findings between the jury and the judge in these consolidated cases and to render a single opinion based on the record." Id. at 1065. In addition to the above cited cases, this Court has also reviewed all of the earlier cases discussed in McCullough. Going all the way back to the case of Bishop v. Shelter Insurance Company, 461 So.2d 1170 (La.App. 3 Cir.1984) and coming right up to the present, a number of these bifurcated trial cases refer to "a bifurcated trial where the jury and the judge reach conflicting findings of fact." However, after reviewing all of the cases on this issue, we find that the "conflicting findings of fact" referred to are what might be better described as conflicting results, e.g., where the judge and jury allocate liability differently or make different damage awards. In the instant case, assuming that the judge and jury made different findings concerning the wetness of the floor, the result that they reached, that Tulane was 100% at fault and that the EMS crew was not at fault, was completely consistent. A reasonable fact finder could have gone either way on the issue of how wet the floor was.
In Bishop, supra, the jury found that one defendant was 10% at fault and that another was 30% at fault. The judge found that the Department of Transportation was free from fault. On appeal, the plaintiff argued with compelling logic that the jury implicitly must have found the Department of Transportation to be 60% at fault as it was the only other party to whom the 60% balance of the fault could have been attributed, which would necessarily conflict with the judge's finding that the Department of Transportation was free from fault:
However, regardless of the jury's intention, it did not, as a matter of law have the right or the duty to determine whether the Department of Transportation was at fault and, if so, the percentage thereof. LSA-R.S. 13:5105 clearly provides that, "No suit against the state or a state agency or a political subdivision shall be tried to a jury." Thus, as a matter of law, the jury verdict has no weight on the issue of the State's fault. It follows that since there is no conflict between the finding of fact by the jury and that by the judge on the issue of the State's fault. It follows that since there is no conflict between the triers of *587 fact, there is no need for the Court of Appeal to harmonize in accordance with the jurisprudence discussed above. It also follows that in our appellate review of the facts found by the jury and the facts found by the trial judge the applicable rule will be the well established test of whether the trier of fact was clearly wrong.
Id., 461 So.2d at 1174.
Similarly, in the bifurcated trial in Lasswell v. Matlack, Inc., 527 So.2d 1199 (La. App. 3 Cir.1988), the jury found one defendant free from fault, another 70% at fault, and the DOTD 30% at fault. However, the trial court found the DOTD free from fault. On review, the appellate court held:
We find no error in the action of the trial court and accordingly there is no need for this court to harmonize the conflicting findings. As a matter of law, the jury had no right or duty to adjudicate the fault of DOTD or assign any percentage of fault to it. Therefore, the jury's verdict had no weight as to the issue of DOTD's fault and there was no conflict between the findings of the jury and the trial judge. LSA-R.S. 13:5105; Dean v. Terrebonne Parish Police Jury, 510 So.2d 82 (La.App. 1st Cir.1987); Bishop v. Shelter Insurance Company, 461 So.2d 1170 (La.App. 3 Cir.1985), writ denied, 465 So.2d 737 (La.1985).
Lasswell, at p. 1201.
What Lasswell says is that for the jury to find one defendant 70% at fault does not conflict with the finding by the judge that the DOTD is free from fault, even where the jury found the DOTD to be 30% at fault because the jury had no authority to determine the fault of the DOTD.[7] Only, for example, if the jury had found another defendant to be 60% at fault and the judge had found the DODT to also be 60% at fault would an irreconcilable inconsistency have arisen, the theory apparently being that the judge and jury need not assign all fault, but that they can in no event assign more than 100% of the fault.
In the instant case, the results are even more consistent than they were in Bishop[8] and Lasswell because in the instant case there is not even an implicit inconsistency between the judge and the jury concerning the allocation of fault. All fault was assigned and it added up to 100%. Applying the manifest error standard of review to the findings of both the judge and the jury in the instant case causes no inconsistency in result and does not raise the problem posed by the Supreme Court in Powell v. Regional Transit Authority, 96-0715, p. 6 (La.6/18/97), 695 So.2d 1326, 1330, where it was pointed out that the application of the manifest error standard of review to the results of both the judge and the jury where the two conflicted "would not reconcile conflicting decisions if each decision was supported by record evidence and therefore was not manifestly erroneous." In spite of the Supreme Court's reference to this problem in *588 Powell, it elected not to resolve it. Therefore, in the instant case, where there is no inconsistency in the results reached by both judge and the jury, both are entitled to the deference afforded by the manifest error standard of review. The facts in the instant case do not reach the threshold where this Court's holding in McCullough could be invoked to justify a de novo review of the findings of both the judge and the jury.
Although this result gives preference to the three tiered system of justice over what logic might seem to dictate, it seems like the proper solution until such time as the Supreme Court decides to give the lower courts more definitive guidelines.
Yolanda Lacroix, the bystander nurse, testified that she didn't recall seeing or feeling any water on the floor and she doesn't recall her ball-gown being stained or soiled by water damage.
Rommel Madison, D.D.S., the decedent's cousin was on his knees assisting Dr. Hightower with the CPR. He didn't notice any water on the floor and his pants did not get wet at all.
Robert Royal, a food service supervisor, testified that he saw no serious areas of water on the ballroom floor that evening, only some areas where someone may have dropped some ice.
Brent Washington, the husband of the decedent's niece, testified on direct examination that he saw nothing on the floor and on cross-examination he testified specifically that there was no water on the floor. The defendants dismiss his testimony as biased, but the jury was entitled to weigh that in making credibility determinationsand we must infer that the jury found Mr. Washington's testimony to be credible.
Therefore, the fact that the record contains contrary evidence that would permit a reasonable fact finder to conclude that the floor was wet, does not mean that the jury was manifestly erroneous in concluding, as it must have, that Nurse Deason was not prevented by reason of wetness from defibrillating the decedent. There is nothing so internally inconsistent or unworthy of belief in the testimony of Ms. Lacroix or Dr. Madison or Mr. Royal or Mr. Washington that would prevent a reasonable fact finder from inferring that wetness would not have prevented Nurse Deason from defibrillating the defendant had she thought to do so. We cannot say that the jury was unreasonable or clearly wrong choosing to credit the testimony of these witnesses and in inferring from that testimony that wetness was not an issue, in preference to contrary testimony from other witnesses. For example, while Michael Demots, the Senior Supervisor of Public Safety at the Convention Center may have testified that he saw water, we infer that the confidence of the jury in that testimony was undermined by the fact that Mr. Demots made no mention of water on his written incident report form in the space provided for such observations.
Additionally, the defendants contend that Nurse Deason's decision about whether it was too wet to defibrillate safely would be a judgment call, and therefore could not be considered to be a deviation from a standard of care. However, Nurse Deason testified that the presence of water was not a factor that entered into her decision making process.
Therefore, this case really boils down to two questions: (1) Was Nurse Deason negligent in failing to bring with her or promptly send for the heart monitor/defibrillator, and (2) did this negligence contribute to the decedent's death and/or the loss of his chance of survival?
*589 Plaintiffs introduced several excerpts from the ACLS textbook. Because Nurse Deason had had ACLS training, it was reasonable to hold her to the standards set forth in this text. One excerpt from the ACLS text describes the "IMPORTANCE OF DEFIBRILLATION":
A simple rationale supports defibrillation as early as possible:
 The most frequent initial rhythm in sudden cardiac arrest is V.F.
 The only effective treatment for VF is electrical defibrillation.
 The probability of successful defibrillation diminishes rapidly over time.
Here is another relevant excerpt:
EARLY DEFIBRILLATION
Health professionals who have a duty to respond to a person in cardiac arrest should have a defibrillator available either immediately or within 1-2 minutes.
Finally, here is another excerpt:
In emergencies, critical medical procedures must be performed by the first trained personnel who respond.
Nurse Deason was the first responder in this case. Nurse Deason's training had taught her that the emergency call of "man down" could include a cardiac event. She acknowledged that her ACLS training had taught her that the best way of determining heart rhythm is with a heart monitor. In the room where she was stationed she had at her disposal a portable unit with a shoulder strap that was a combination heart monitor/defibrillator. It was kept on top of the rolling "code cart" or "crash cart" which contained cardiac medication, IV fluids, airways and electric equipment. She also knew that a possible cause of the unconscious condition she found the decedent to be in along with his abnormal (agonal) breathing could be unstable ventricular tachycardia, a condition for which defibrillation is generally indicated.
When she arrived on the scene she did not identify herself as a nurse to Dr. Hightower who was kneeling by the dying decedent. However, she was wearing a lab coat and was carrying medical equipment. She did not tell Dr. Hightower she had a defibrillator or cardiac medication across the hall. She explained this by saying that it was noisy, making communication difficult and that her "major goal was to make sure the man was getting the oxygen that he needed to survive." She testified that, "I immediately assessed the status of the patient and saw that he had respiration. I opened his airway, started that process and asked for an ambulance."
In questioning Nurse Deason, the plaintiff brought out that she had brought a wheel chair with her which proved worthless under the circumstances, but didn't bring the "crash cart" which contained equipment that could have been useful should the emergency prove to be as dire as it proved to be. It does not take a medical expert to understand that it is difficult to envision a situation wherein a wheel chair would be of immediate value in a true emergency, but that it would be easy to envision an emergency wherein the crash cart could be of value. Even a layman would consider a cardiac event as one of the likely causes when someone collapses under circumstances such as existed in the instant case. In other words, common sense would tell one that "man down" could mean a cardiac event. Common sense would also tell one that if "man down" turned out to be a true emergency, which any responder would know is a reasonable possibility, that the rolling crash cart (which in this case also happened to include the heart monitor/defibrillator) could be of immediate value whereas the wheel chair would not. For example, if it *590 turned out that the decedent had had a stroke or swallowed something that blocked his windpipe, other likely possibilities in a party setting, the wheelchair could serve no crisis value. The defendants do not contend that it would have taken Nurse Deason any longer to wheel in the crash cart than it took her to wheel in the wheel chair, i.e., the defendants do not contend that it would have put Nurse Deason at any material time disadvantage to bring the rolling crash cart instead of the wheel chair.
Rhonda Green, R.N. testified for the plaintiffs. She is an ACLS certified nurse whose experience included eight years as an Emergency Room supervisor.
When Nurse Green was asked:
Now, based on everything you have reviewed considering your testimony, considering the inspection of the scene, considering the depositions that you've reviewed and so forth, to a reasonable degree of certainty did Jo Deason more probable [sic] than not violate and breach the standard of care for [registered nurses] who are ACLS trained in providing care to Mr. Madison at the Convention Center?
She responded: "Yes, I think she did." She also acknowledged familiarity with ACLS statistics showing that there is a greater than 70% survival rate where someone with a proper shockable heart rhythm is defibrillated promptly.
In a medical malpractice action against a physician, the plaintiff carries a two-fold burden of proof. The plaintiff must first establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained. LSA-R.S. 9:2794; Martin v. East Jefferson General Hosp., 582 So.2d 1272, 1276-1277. Resolution of each of these inquires are determinations of fact which should not be reversed on appeal absent manifest error. Id,; Descant v. Administrators of Tulane Educational Fund, 95-2127, p. 8-9 (La. App. 4 Cir. 1/21/98), 706 So.2d 618, 628. If the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Martin, supra. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id.; Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). The determination of an expert's credibility is also a factual question subject to the manifestly erroneous/clearly wrong standard of review. Id.; Martin, supra. The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Lasyone v. Kansas City Southern R.R., 00-2628 (La.4/3/01), 786 So.2d 682. The evaluation of and resolution of conflicts in expert testimony are factual issues to be resolved by the trier of fact, and the determinations of the fact finder should not be disturbed on appeal in the absence of manifest error. Id.
Dr. Salvadore Velazquez, an expert cardiologist, testified on behalf of the plaintiffs. He rendered an opinion based on the assumption that the decedent collapsed at approximately 2:04 a.m.; that Nurse Deason was notified at 2:05 a.m.; that at 2:07 a.m., Nurse Deason noted that the decedent had a pulse and was breathing; that between 2:07 a.m. and 2:10 a.m. she recommended to bystanders and friends that they continue CPR on the *591 decedent; that the decedent went into full cardiac arrest at 2:10 a.m.; that the paramedics arrived at 2:16 a.m. or 2:17 a.m. at which time they placed a heart monitor on the decedent and determined that there was asystor, i.e., no electrical activity; at 2:17 a.m. the paramedic noted ventricular fibrillation; and at 2:12 a.m. the decedent was administered an electrical shock with a defibrillator. Dr. Velazquez testified that at 2:07 a.m., the decedent,
had a pulse and a respiration so therefore that demonstrated that Mr. Madison had some type of rhythm in the heart that was provided the profusion and allowed him to have electrical and mechanical pumping of the heart.
Dr. Velazquez went on to explain that profusion "means blood flow going to various parts of the body":
I have to base my presumption that the most common cause for someone to have a cardiac arrest and they collapse has been demonstrated that is ventricular tyachcardia and ventricular fibrillation.
Dr. Velazquez testified that at the time Nurse Deason detected the decedent's pulse he could not have been in either ventricular fibrillation or Acystal (no electrical activity). Because the decedent was also breathing at the time, Dr. Velazquez asserted that there was "profusion" and that he must have been alive. Dr. Velazquez then testified that about 80% of the time in cardiac events such as the one to which the decedent succumbed, the process starts with ventricular tachycardia and progresses to ventricular fibrillation. Dr. Velazquez blamed a lack of oxygen for causing the irregular heartbeat that led to the decedent's cardiac arrest. This lack of oxygen Dr. Velazquez attributed to the hardening of the arteries.
Dr. Velazquez's review of the autopsy showed no heart rupture, which would have caused immediate death. Therefore, Dr. Velazquez concluded that had the decedent been defibrillated at the time it was noted that his heart had stopped, 2:10 a.m., there should have been a 70 to 80 percent chance of bringing the heart back to perfusion rhythm, i.e., a "rhythm that is compatible with life." Dr. Velazquez opined that the decedent's enlarged heart would not have prevented the decedent's survival had early defibrillation been administered. Dr. Velazquez considered the effects of other aspects of decedent's cardiac health and history and still concluded that the decedent probably had a 70 percent chance of survival with early defibrillation, and at least a fifty percent chance.
On cross-examination Dr. Velazquez also noted that the movement in this country and elsewhere "to have defibrillators in most public places is because [the] best chance that anyone can have to survive a sudden cardiac arrest is if that person is defibrillated promptly."
The defendants contend that Dr. Velazquez's assumptions are faulty because he was not aware of the fact that the paramedic report noted that the decedent's pupils were fixed and dilated which, according to the defendants' expert, Dr. Joseph Litner, would mean that the decedent had probably been brain dead for over half an hour. The defendants seem to imply that Dr. Velazquez may not have read the paramedic report. We note that near the beginning of his testimony when he was asked to list "some of the documents that you reviewed" he made no specific reference to the paramedic report. However, the question did not call upon him to list all documents that he reviewed, and it becomes apparent that Dr. Velazquez reviewed the paramedic report when he subsequently testified that:
At 2:17 according to the notes of the paramedic the patient was in ventricular *592 fibrillation. That means in a regular rhythm of the heart. At 2:22 they mention a defibrillator that the patient received an electrical shock. [Emphasis added.]
Although, Dr. Velazquez's testimony did not specifically refer to that portion of the paramedic report where the fixed and dilated pupils were noted, there is nothing in the record to suggest that Dr. Velazquez overlooked any portion of the report, including the reference to the fixed and dilated pupils. Nowhere in the record do we find any reference to the decedent's fixed and dilated pupils when the defendants had the opportunity to cross-examine Dr. Velazquez regarding that issue. In effect, the defendants are suggesting on appeal that Dr. Velazquez failed to answer a question they never asked him, from which they wish this Court to infer that if he had been asked, his answer would have been favorable to the defense.[9] We find that the failure of Dr. Velazquez to address an issue of importance to the defense that the defense failed to raise when it had the opportunity to do so, does not create a presumption that Dr. Velazquez was unaware of the reference to fixed and dilated pupils in the paramedic report.
The Supreme Court explained the standard to be used in determining whether a JNOV is appropriate in Davis v. Wal-Mart Stores, Inc., 00-0445, p. 4-5 (La.11/28/00), 774 So.2d 84, 89:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. Smith v. Davill Petroleum Company, Inc. d/b/a/ Piggly Wiggly, 97-1596 (La.App. 1 Cir. 12/9/98), 744 So.2d 23. See also Powell v. RTA, 96-0715 (La.6/18/97), 695 So.2d 1326; Anderson v. New Orleans Public Service, 583 So.2d 829 (La.1991); State of Louisiana, DOTD v. Scramuzza, 95-786 (La.App. 5 Cir. 4/3/96), 673 So.2d 1249; Seagers v. Pailet, 95-52 (La.App. 5 Cir. 5/10/95), 656 So.2d 700; Engolia v. Allain, 625 So.2d 723, 728 (La.App. 1 Cir. 1993); Adams v. Security Ins. Co. Of Hartford, 543 So.2d 480, 486 (La.1989).
This is a tougher standard than preponderance of the evidence or even manifest error because the credibility of witnesses is not to be evaluated and all reasonable inferences of factual issues are to be resolved in favor of the non-moving party, which would mean the plaintiffs in the instant case. Consequently, as we have found no manifest error in the judgment of the trial court and in the verdict rendered by the jury, per force we find no error in *593 the refusal of the trial court to grant Tulane's motion for a JNOV.
Similarly a directed verdict is appropriate only when the evidence overwhelmingly points to one conclusion. Hebert v. BellSouth Telecommunications, Inc., 01-00223 (La.App. 3 Cir. 6/6/01), 787 So.2d 614. A directed verdict should be granted when, after considering all evidence in light and with all reasonable inferences most favorable to movant's opponent, it is clear that facts and inferences point so overwhelmingly in favor of granting the directed verdict, that reasonable jurors could not arrive at a contrary result. Reed v. Columbia/HCA Information Systems, Inc., 00-1884 (La.App. 5 Cir. 4/11/01), 786 So.2d 142, writ denied XXXX-XXXX (La.6/22/01), 794 So.2d 796. If there is substantial evidence opposed to the motion for directed verdict, i.e., evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied and the case submitted to the jury. Brockman v. Salt Lake Farm Partnership, 33,938 (La.App. 2 Cir. 10/4/00), 768 So.2d 836, writ denied 00-3012 (La.12/15/00), 777 So.2d 1234.
Tulane contends, based on the testimony of the decedent's widow, that it was error for the trial court to deny its motion for a directed verdict because the decedent collapsed a full hour before Nurse Deason was summoned to the scene. This Court has already explained earlier in this opinion that Mrs. Madison must have just been an hour off on the time and that it is unreasonable to believe that the decedent collapsed at 1:05, but no one thought to summon help for an hour. For the same reasons why we rejected Tulane's argument in connection with its JNOV motions, we must also reject Tulane's directed verdict arguments.
As a final issue, the defendants complain that, even if they were to concede the issue of liability for purposes of argument only, the amount awarded to the plaintiffs was clearly excessive "because of the poor quality of life that more probably would have resulted for Mr. Madison even assuming he could have been revived." The defendants contend that Mr. Madison was already brain dead when Nurse Deason was summoned and, therefore, at most only a nominal amount should have been awarded. Defendants' argument in this regard is based entirely on the testimony of their expert, Dr. Joseph Litner, who testified that in his experience a person is brain dead 20 to 30 minutes before the pupils become fixed and dilated. According to this line of reasoning and based on the EMS report showing fixed and dilated pupils at 2:17 a.m., the decedent would have been brain dead prior to the time Nurse Deason was summoned to the scene. However, Dr. Litner offered nothing more than his own opinion in this regardno reference to any medical studies, texts or treatisesand the fact finder is free to reject his opinion in favor of the testimony of Dr. Magoon and Dr. Velazquez who both testified concerning the decedent's chance of survival. Their opinions, as discussed previously, included a review of the EMS reportthe report that referred to the fixed and dilated pupils. Moreover, Nurse Deason made no mention of fixed and dilated pupils in her report creating the possibility that the fact finder merely decided that the EMS report was in error in this regard. Furthermore, the time line suggested by the defendants' argument on this issue would have meant that the decedent was brain dead prior to 2:00 p.m., prior to the time it is most reasonable to assume that he collapsed. Nor is the defendants' reference to Clark v. City of Shreveport, 31,407 (La.App. 2 *594 Cir. 1/20/99), 726 So.2d 1042, persuasive. The brain dead decedent in Clark died of a gunshot wound to the head under facts too different from those of this case to permit of any helpful comparison. Unlike the decedent in the Clark case, the decedent in the instant case sustained no trauma to the head likely to directly cause brain damage and death.
As the defendants did not object to the amounts awarded other than on the theory that the decedent was brain dead and was, therefore, not deprived of any valuable quality of life, an argument we have rejected, we need not consider whether the awards were an abuse of the great and vast discretion of the fact finder. Regardless, and without going into any uncalled for detail, after reviewing the record as a whole, we find no such abuse of discretion.
For the foregoing reasons the judgment on the merits signed on December 14, 1999, is affirmed. The judgment of March 5, 2001 concerning the taxing of costs is reversed.
JUDGMENT OF DECEMBER 14, 1999, AFFIRMED; JUDGMENT OF MARCH 5, 2001, REVERSED.
NOTES
[1] There are countless obvious and not so obvious transcription errors in the record. Both appellants and appellees indicated that they had no objection to the corrections offered by their counterparts. This Court, therefore, agreed to grant the motions made by both sides suggesting corrections to the transcript.
[2] This sum was broken down as follows: To Lillie Madison $200,000.00 for loss of love and affection and $436,000.00 for loss of support; To Thaddeus Madison and Edward Madison $75,000.00 each for loss of love and affection; and $6,000.00 for funeral expenses.
[3] There does not seem to be any dispute between the parties as to the meaning of "chance of survival" Instead, Tulane's appeal is based on the contention that no chance of survival existed by the time their employee, Nurse Deason, arrived on the scene. Therefore, according to Tulane, even if Nurse Deason was negligent, her negligence was not a cause in fact of the decedent's death or loss of chance of survival.
[4] Where there is no inconsistency, it is undisputed that the factual findings of both the judge and the jury are reviewed under the manifest error/clearly wrong standard.
[5] In Clement v. Frey, 95-1119 (La. 1/16/96), 666 So.2d 607, the Supreme court rejected the de novo standard of review employed by the appellate court in Cornish in apportioning fault, but for reasons unrelated to the inconsistent results arising out of the bifurcated trial.
[6] This case was reversed in part by the Supreme Court, 627 So.2d 1358 (La.1993), but the opinion of the Supreme Court made no mention of the problem of conflicting results in bifurcated trials.
[7] The reasoning in Lasswell in this regard was followed in Ourso, supra. Ourso notes the conflict with this Court's leading case on this issue, McCullough, which Ourso says would mandate a de novo review instead of finding no conflict where the conflict arises out of the judge or jury making findings transcending the scope of their authority.
[8] We recognize that in dicta in Bishop the court referred to the duty of the reviewing court to "harmonize" inconsistent judge and jury results in bifurcated trials which is different from the "independent review" requirement adopted for this circuit in McCullough. However, this minor technical difference between the circuits which is discussed at length and with great erudition in McCullough, is not relevant here where there is no conflict in the allocation of fault as there was in McCullough.
[9] "None of the plaintiffs' experts seemed aware of the fact that the ambulance run report noted the fixed and dilated pupils at 2:17 A.M." Likewise, Dr. Magoon, another of plaintiffs testified that he "reviewed the EMS run records at that time ..." and gave other testimony indicative of familiarity with the EMS report. Again, the defense failed to ask him any questions about the decedent's fixed and dilated pupils when they had the chance to do so on cross-examination.